1  Robert N. Phan (Bar No. 217283)
   Juan D. Garcia (Bar No. 215980)
2  **GARCIA & PHAN, A Prof. Law Corp.**
   17011 Beach Blvd., Suite 540
3  Huntington Beach, California 92647
   714-848-8200 (Main)
4  714-677-4005 (Facsimile)
   rphan@garciaphan.com
5
   John D. Tran (Bar No. 231761)
6  **RHEMA LAW GROUP, P.C.**
   1 Park Plaza, Suite 600
7  Irvine, California 92614
   949-852-4430 (Main)
8  866-929-3519 (Facsimile)
   jdt@rhemalaw.com
9
   Attorneys for Plaintiff,
10 DEFENSTECH INTERNATIONAL, INC.

11

12                 UNITED STATES DISTRICT COURT

13        CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

14

15 DEFENSTECH INTERNATIONAL,         )  CASE NO. CV13 - 00179 JST (ANx)
   INC.,                             )
16                                   )  **COMPLAINT FOR INJUNCTION,**
              Plaintiff,             )  **EQUITABLE RELIEF, AND**
17                                   )  **DAMAGES RESULTING FROM:**
          vs.                        )
18                                   )  1. **FRAUDULENT**
   FYFE CO., LLC; FYFE               )     **MISREPRESENTATION**
19 ENTERPRISES, INC.; HEXCEL-FYFE    )  2. **FRAUDULENT CONCEALMENT**
   CO., LLC; FIBRWRAP                )  3. **BREACH OF FIDUCIARY DUTY**
20 CONSTRUCTION, L.P.; FIBRWRAP      )  4. **BREACH OF CONTRACT**
   CONSTRUCTION, INC.; FYFE          )  5. **BREACH OF THE IMPLIED**
21 GROUP, LLC; FYFE BETA, INC.;      )     **COVENANT OF GOOD FAITH**
   FIBRWRAP CONSTRUCTION             )     **& FAIR DEALING;**
22 CANADA LIMITED; FYFE              )  6. **DECLARATORY RELIEF**
   HOLDINGS, LLC; FIBRWRAP           )  7. **DISREGARD OF CORPORATE**
23 CONSTRUCTION SERVICES, INC.;      )     **FICTION**
   FIBRWRAP CONSTRUCTION             )  8. **MISAPPROPRIATION OF TRADE**
24 SERVICES USA, INC.; EDWARD        )     **SECRETS**
   ROBERT FYFE; HEATH CARR; and      )  9. **PATENT INFRINGEMENT**
25 DOES 1 through 100, inclusive,    )  10. **VIOLATION OF BUSINESS AND**
                                     )     **PROFESSIONS CODE § 17200 et**
26            Defendants.            )     **seq.**
                                     )
27                                   )  **DEMAND FOR JURY TRIAL**
                                     )
28

# I.

## **INTRODUCTION**

The case before this Court is a case of fraud, misrepresentation, deception, and the purposeful multiple violations of federal patent law committed between November 20, 2009 through August 29, 2011 by Defendant, EDWARD ROBERT FYFE, a former director and 20% shareholder of Plaintiff, DEFENSTECH INTERNATIONAL, INC. ("DEFENSTECH" or "Plaintiff"), individually, and jointly with the individuals and corporate Defendants above named.

FYFE had sold all rights to his bomb mitigation patent (U.S. Patent No. 6,806,212 B2 dated October 19, 2004 titled *"Coatings and Method for Strengthening a Structure"* (hereinafter the "212 Patent")) to DEFENSTECH only to have that same Patent secretly and unlawfully transferred and assigned to **five** (5) other business entities controlled and operated by Defendant EDWARD ROBERT FYFE and Defendant HEATH CARR, an officer, director, owner and general manager of the Fyfe related entities, without DEFENSTECH's knowledge or consent, in a scheme to defraud DEFENSTECH, the ultimate result of which was the sale of the Fyfe controlled entities to a public company, Aegion[1], for $115,800,000 cash. The said sale closed only days before the Defendants transferred Plaintiff's Patent back into Plaintiff's name. Aegion is coincidently now in the bomb blast mitigation business and upon information and belief, Defendants have unlawfully licensed DEFENSTECH's Patent to other third parties, and the general public, including fraud committed directly on the United States Patent and Trademark Office.

Throughout the relevant time line, Defendant, EDWARD ROBERT FYFE, breached his fiduciary duties to DEFENSTECH, usurped corporate opportunities at the expense of DEFENSTECH and its shareholders, and infringed upon DEFENSTECH's rights to the subject Patent. Each of the Defendants named herein played a pivotal role in

---

[1] see Form 8-K dated August 31, 2011, Insituform Technologies, Inc. (AEGION) Exhibit "F").

1   the fraud and unlawful conduct that subsequently took place, which has deprived

2   DEFENSTECH of significant revenues. Plaintiff now looks to this Court to right these

3   wrongs.

4                                          **II.**

5                                  **THE PARTIES**

6          1. Plaintiff, DEFENSTECH INTERNATIONAL, INC. ("DEFENSTECH" or

7   "Plaintiff") is now, and at all times relevant to this action was, a Nevada corporation

8   qualified to conduct business within the State of California.

9          2. Plaintiff is informed and believes and upon such information and belief alleges

10  that Defendant, FYFE CO., LLC ("FYFE CO" or "Defendant"), at all times relevant to

11  this action, is a Delaware limited liability company registered to conduct intrastate

12  business within the State of California and conducted business within this State and

13  County.

14         3. Plaintiff is informed and believes and upon such information and belief alleges

15  that Defendant, FYFE ENTERPRISES, INC. ("FYFE ENTERPRISES" or "Defendant"),

16  at all times relevant to this action, is a Delaware corporation registered to conduct

17  intrastate business within the State of California and conducted business within this State

18  and County.

19         4. Plaintiff is informed and believes and upon such information and belief alleges

20  that Defendant, HEXCEL-FYFE CO., LLC ("HEXCEL-FYFE" or "Defendant"), at all

21  times relevant to this action, is an unknown business entity which conducted business

22  within this State and County.

23         5. Plaintiff is informed and believes and upon such information and belief alleges

24  that Defendant, FIBRWRAP CONSTRUCTION, L.P. ("FCLP" or "Defendant"), at all

25  times relevant to this action, is a Delaware limited partnership registered to conduct

26  intrastate business within the State of California and conducted business within this State

27  and County.

28         6. Plaintiff is informed and believes and upon such information and belief alleges

Fyfe - p-complaint 01-23-13.wpd                    3

1  that Defendant, FIBRWRAP CONSTRUCTION, INC. ("FCI" or "Defendant"), at all

2  times relevant to this action, is an unknown business entity which conducted business

3  within this State and County.

4       7.  Plaintiff is informed and believes and upon such information and belief alleges

5  that Defendant, FYFE GROUP, LLC ("FYFE GROUP" or "Defendant"), at all times

6  relevant to this action, is a Delaware limited liability company registered to conduct

7  intrastate business within the State of California and conducted business within this State

8  and County.

9       8.  Plaintiff is informed and believes and upon such information and belief alleges

10  that Defendant, FYFE BETA, INC. ("FYFE BETA" or "Defendant"), at all times relevant

11  to this action, is a *dissolved* corporation that was registered to conduct intrastate business

12  within the State of California and conducted business within this State and County.

13       9.  Plaintiff is informed and believes and upon such information and belief alleges

14  that Defendant, FIBRWRAP CONSTRUCTION CANADA LIMITED ("FIBRWRAP

15  CANADA" or "Defendant"), at all times relevant to this action, is an unknown business

16  entity which conducted business within this State and County.

17       10.  Plaintiff is informed and believes and upon such information and belief

18  alleges that Defendant, FYFE HOLDINGS, LLC ("FYFE HOLDINGS" or "Defendant"),

19  at all times relevant to this action, is a Delaware limited liability company registered to

20  conduct intrastate business within the State of California and conducted business within

21  this State and County.

22       11.  Plaintiff is informed and believes and upon such information and belief

23  alleges that Defendant, FIBRWRAP CONSTRUCTION SERVICES, INC. ("FCSI" or

24  "Defendant"), at all times relevant to this action, is a Delaware limited liability company

25  registered to conduct intrastate business within the State of California and conducted

26  business within this State and County.

27       12.  Plaintiff is informed and believes and upon such information and belief

28  alleges that Defendant, FIBRWRAP CONSTRUCTION SERVICES USA, INC. ("FCS

1    USA" or "Defendant"), at all times relevant to this action, is a Delaware limited liability

2    company registered to conduct intrastate business within the State of California and

3    conducted business within this State and County.

4        13.  Plaintiff is informed and believes and upon such information and belief

5    alleges that Defendant, EDWARD ROBERT FYFE ("Mr. Fyfe" or "Defendant"), is, and

6    at all times herein mentioned was, an individual residing in the County of San Diego.

7    Plaintiff is informed and believes and upon such information and belief alleges that at all

8    relevant times, Mr. Fyfe was the controlling officer, owner, principal, director, and

9    shareholder of FYFE CO,  FYFE ENTERPRISES, HEXCEL-FYFE, FCLP, FCI, FYFE

10   GROUP, FYFE BETA, FIBRWRAP CANADA, FYFE HOLDINGS, FCSI, and FCS

11   USA (hereinafter and collective the "FYFE CORPORATE DEFENDANTS").

12       14.  Plaintiff is informed and believes and upon such information and belief

13   alleges that Defendant, HEATH CARR ("Mr. Carr"), is, and at all times herein mentioned

14   was an individual residing in the County of San Diego. Plaintiff is informed and believes

15   that upon such information and belief alleges that at all relevant times, Mr. Carr, was a

16   controlling officer, owner, principal, director, general manager of the "FYFE

17   CORPORATE DEFENDANTS")

18       15. Plaintiff is informed and believes and upon such information and belief alleges

19   that Defendants Mr. Fyfe and Mr. Carr are the controlling officers of the FYFE

20   CORPORATE DEFENDANTS (Collectively the "FYFE OFFICERS").

21       16.  Plaintiff is ignorant of the true names and capacities of Defendants sued

22   herein as DOES 1 - 100 Inclusive, and therefore sues these defendants by such fictitious

23   names.  Plaintiff will amend this complaint to allege their true names and capacities when

24   ascertained.  Plaintiff is informed and believes and based thereon alleges each of the

25   fictitiously named Defendants is responsible in some manner for the injuries to Plaintiff

26   alleged herein and that such injuries as herein alleged were proximately caused by such

27   defendants.  Plaintiff is further informed and believes and thereon alleges that each of

28   these fictitiously named Defendants claim some right, title, estate, lien, or interest in the

Fyfe - p-complaint 01-23-13.wpd                              5

1  hereinafter described property adverse to Plaintiff's title and their claims, and each of

2  them, constitute a cloud on Plaintiff's title to that property.

3       17.  At all times herein mentioned, each of the Defendants was the partner, servant,

4  agent, joint venturer, or employee of each of the remaining Defendants and were acting

5  within the course and scope of their position, service, agency, venture, or employment.

6  Plaintiff is informed and believes and thereon alleges that each Defendant ratified,

7  approved, and adopted the conduct of the other Defendants.

8       18.  Plaintiff is informed and believes and thereon alleges that each of the

9  aforementioned Defendants either acted or caused actions to occur which caused damages

10  to Plaintiff, or that each of said Defendants is an agent for each other Defendant and

11  either acted or caused actions to occur which caused damages to Plaintiff. Specifically,

12  without restricting the generality of the foregoing, the FYFE OFFICERS acted in concert,

13  with specific knowledge of the Agreements between Fyfe and DefensTech, and the sale

14  of the Patent described below by Mr. Fyfe to DefensTech.

15       19.  Plaintiff is informed and believes and thereon alleges that Defendants, Does 1

16  through 100, and each of them, had knowledge of, joined in the formation of, and

17  participated in, or aided and abetted, in a scheme to defraud or otherwise harm Plaintiff

18  with each of the other Defendants by committing the acts alleged herein and that the acts

19  were committed in furtherance of a conspiracy to harm Plaintiff and which resulted in

20  Plaintiff's damages herein.

21       20.  Any applicable statutes of limitations have been tolled by the Defendants'

22  continuing, knowing, and active concealment of the facts alleged herein.  Despite

23  exercising reasonable diligence, Plaintiff could not have discovered, did not discover, and

24  was prevented from discovering, the wrongdoing complained of herein until recently in

25  March of 2012.

26       21.  In the alternative, Defendants should be estopped from relying on any statutes

27  of limitations.  Defendants have been under a continuing duty to disclose to Plaintiff the

28  true character, nature, and any business transactions that involve or infringe upon

1   Plaintiff's patent. Defendants owed Plaintiff an affirmative duty of full and fair

2   disclosure, but knowingly failed to honor and discharge such duty.

3   ## III.

4   ## JURISDICTION AND VENUE

5       22. This court has subject matter jurisdiction pursuant to 35 U.S.C. 271, 281-285,

6   28 U.S.C. 1331 and 1338(a). Venue is proper in this district pursuant to 28 U.S.C.

7   1391(b) and (c).

8       23. The Court has personal jurisdiction over each Defendant. Each Defendant has

9   conducted and does conduct business within the State of California. Furthermore, each

10   defendant, directly and/or through intermediaries (including distributors, retailers and

11   others) ships, distributes, offers for sale, sells and/or advertises its products in the United

12   States, the State of California, and within the Central District of California. Each

13   Defendant has purposefully and voluntarily placed one or more of its infringing products,

14   as described herein, into the stream of commerce with the expectation that they will be

15   purchased by consumers residing within and/or doing business within the Central District

16   of California. These infringing products have been and continue to be purchased by

17   consumers residing within and/or doing business within of the Central District of

18   California. Each Defendant has committed the tort of patent infringement within the

19   State of California and more particularly, within the Central District of California.

20   ## IV.

21   ## STATEMENT OF FACTS

22       24. DEFENSTECH is a company that was initially formed in January of 2005 by

23   Alan R. Sporn, a Veteran and member of the Orange County Sheriff's Department

24   Reserve Program.

25       25. At the time that DEFENSTECH was formed, Mr. Sporn and his associates

26   were developing and testing ballistic door panels that could be used in police vehicles, to

27   offer police officers a first line of defense from gun fire. In addition to the Ballistic Door

28   Panel concept, Mr. Sporn wanted DEFENSTECH to be a technology-based company that

1  also offered bomb blast and seismic protection for buildings, considering the aftermath of

2  9-11.

3      26.  In or about August of 2005, Mr. Sporn spent a considerable amount of

4  research on various patents that DEFENSTECH hoped to acquire in order to be able

5  achieve DEFENSTECH's goals.  It was around that time when Mr Sporn came across

6  U.S. Patent No. 6,806,212 B2 dated October 19, 2004 titled *"Coatings and Method for*

7  *Strengthening a Structure"* (hereinafter the "212 Patent"), which was owned at the time

8  by Defendants, Mr. Fyfe and FYFE CO. (Exhibit A - "212 Patent").

9      27.  After initiating contact by Mr. Sporn, Mr. Fyfe met with Mr. Sporn at Mr.

10  Sporn's home in Laguna Hills, California on/about late August 2005 to discuss the sale of

11  the 212 Patent to DEFENSTECH.  Mr. Fyfe stated that he was interested in selling the

12  patent and specifically represented to Mr. Sporn and others present at the meeting that

13  Mr. Fyfe and his company had not used the 212 Patent for blast mitigation, or as part of

14  any product to be used to provide personal ballistic projectile protection. Mr. Fyfe further

15  stated that he also liked the concept of DEFENSTECH's business strategy which would

16  put this patent to good use in a manner he had not, nor intended to exploit.

17      28.  During the negotiations to purchase the 212 Patent in late August or early

18  September of 2005, Mr. Fyfe again affirmatively represented to DEFENSTECH that Mr.

19  Fyfe had **never** used the 212 Patent in the manner in which DEFENSTECH intended to

20  use it, but that he needed a license back allowing use of the Patent process in the ordinary

21  course of his current business to strengthen certain products he sold. Mr. Sporn agreed to

22  this condition in the presence of William Murphy and Michael Jewell after Mr. Fyfe

23  assured Mr. Sporn that Mr. Fyfe wanted to be involved in DEFENSTECH as a director

24  and shareholder to help the company grow and for the 212 Patent to be utilized to its

25  maximum potential. Mr. Fyfe was also upset that this patent was infringed upon by the

26  company, *"Line-X"* which was awarded the contract at the Pentagon after 9-11.

27      29.  On or about September 10, 2005, Mr. Fyfe, FYFE CO, and Mr. Sporn, on

28  behalf of DEFENSTECH, entered into an Agreement for Purchase and Sale of the "212

Fyfe - p-complaint 01-23-13.wpd

8

1    Patent" (hereinafter the "Agreement").  (Exhibit "B" - Patent Purchase & Sale

2    Agreement.) Pursuant to the terms of the Agreement, Mr. Fyfe was given a cashier's

3    check for $75,000 and two million shares of DEFENSTECH, which accounted for twenty

4    percent (20%) of the company. Contemporaneously, Mr. Fyfe was also made a Director

5    of DEFENSTECH at his request and remained so until the late part of 2011 when he

6    purportedly resigned from his position as director of DEFENSTECH although

7    DEFENSTECH received nothing in writing.

8         30.  In reliance of Mr. Fyfe's promises and representations that he would help

9    grow the company and maintain the integrity of the 212 Patent, DEFENSTECH obtained

10   from Alan Sporn, personally, approximately $2.5 Million dollars which was invested into

11   the company to be used to grow the company. Mr. Fyfe knew of Mr. Sporn's investment,

12   and, as Director, approved the compensation to be given to Mr. Sporn, said compensation

13   being valueless unless DEFENSTECH succeeded in its endeavors.

14        31.  In fact, Mr. Fyfe further approved DEFENSTECH's plan to obtain additional

15   monies from outside investors through private placement financing, which raised

16   approximately $1,300,000.00 in additional funds. Without question, DEFENSTECH and

17   all of these investors had relied upon the integrity 212 Patent and the representations

18   made by Mr. Fyfe. But for such reliance on the promises and representations made by Mr.

19   Fyfe, DEFENSTECH would not have agreed to the loans and resulting significant

20   liabilities when it spent these significant sums of money in its good faith efforts to

21   penetrate the market and provide its products and services to the market, which were

22   ultimately thwarted by Mr. Fyfe, the FYFE OFFICERS, and their agents as specified

23   herein.

24        32.  For example, on September 27, 2007, Mr. Fyfe personally signed a

25   "Unanimous Written Consent of the Board of Directors", approving a $600,000.00 loan

26   from Mr. Sporn to DEFENSTECH.  (Exhibit "C" - Board Resolution.)  Mr. Fyfe

27   remained quiet and allowed DEFENSTECH to continue to accept liabilities for such loans

28   while conspiring and competing directly against DEFENSTECH, without DefensTech's

1  knowledge, through various business entities, controlled and operated by Mr. Fyfe

2  himself, or through collusion with the FYFE OFFICERS, and the use of entities

3  purportedly owned or controlled by them, jointly or severally..

4      33. On January 23, 2008, FYFE CO and Mr. Fyfe executed an amendment to the

5  Agreement, whereby section 10 to Agreement relating to the right of first refusal was

6  deleted and "is of no further force and effect." (Exhibit "D" - Amendment to

7  Agreement.)

8      34. During the period in which Mr. Fyfe was a director of DEFENSTECH, he was

9  also provided and given unfettered access to Plaintiff's confidential and proprietary

10  information, including but not limited to customer lists, supplier list, pricing structure,

11  and other relevant information regarding Plaintiff's business infrastructure. Plaintiff is

12  informed and believes and thereupon alleges that during this entire period, Mr. Fyfe, and

13  the FYFE OFFICERS, jointly and/or severally, through their entities, conspired to obtain

14  and did in fact steal such confidential information to be used for his benefit in operating a

15  competing business or businesses despite his false representations that he was not

16  utilizing the 212 Patent. Plaintiff is informed and believes and thereupon alleges that

17  Defendant's actions and unlawful conduct prevented Plaintiff from securing government

18  contracts for their blast mitigation products and/or services.

19  **OVERVIEW OF DEFENSTECH AFTER THE ACQUISITION OF THE 212**

20  **PATENT**

21      35. Specifically, DEFENSTECH provides the next-generation of *Defend-X*® brand

22  of high performance, proprietary formulated polymer products that can be utilized in a

23  wide range of applications across multiple industries. Based upon years of real-world

24  experience and research, the *Defend-X*® line of Industrial Coatings are the first line of

25  defense in the protection of facilities, equipment and vehicles from impact, corrosion,

26  chemical attack, blast mitigation, and seismic failure.  DEFENSTECH's U.S. Patent No.

27  6,806,212 B2 dated October 19, 2004 titled *"Coatings and Method for Strengthening a*

28  *Structure"* provides for broad market of environmental hardening applications in virtually

Fyfe - p-complaint 01-23-13.wpd                          10

1    any industry. As a result of the combined technologies of the *Defend-X*® polymers,

2    together with DEFENSTECH's patent, the process strengthens virtually any structure,

3    providing protection against physical destruction (man-made or natural) from any type of

4    destructive process.  This includes those deriving from water, ice, blast, and other similar

5    impacts.

6    **DEFENDANTS CONSPIRED AND ASSIGNED THE SAME PATENT TO**

7    **VARIOUS ENTITIES OWNED AND CONTROLLED BY THEM**

8    36.  On December 23, 2009, unbeknownst to DEFENSTECH and its other

9    shareholders, Mr. Fyfe and his entity, HEXCEL-FYFE, fraudulently and feloniously

10   assigned the 212 Patent to FCLP as indicated on the United States Patent and Trademark

11   Office (hereinafter "USPTO"). (Exhibit "E" - USPTO Patent Assignment History.)  This

12   was done despite the fact that Plaintiff, through Mr. Sporn, was the only party that is

13   authorized and able to make any filings with the USPTO as it pertains to the 212 Patent.

14   Additionally, Mr. Fyfe KNEW that Mr. Sporn had a personal UCC lien on ALL the assets

15   of DefensTech, which included the Patent, per the Unanimous Written Consent of the

16   Board of Directors of DefensTech signed by Mr. Fyfe on September 27, 2007, in his

17   capacity as Director of Plaintiff.

18   37.  On the very same date on December 23, 2009, unbeknownst to

19   DEFENSTECH and its other shareholders, Mr. Fyfe caused FCLP to fraudulently and

20   feloniously assign the 212 Patent to FYFE GROUP.  (Exhibit "E" - USPTO Patent

21   Assignment History.)

22   38.  As of July 26, 2011, Mr. Fyfe had entered into negotiations to sell his

23   companies to INSITUFORM TECHNOLOGIES, INC. ("INSITUFORM").

24   39.  On July 27, 2011, INSITUFORM announced that it had entered into an

25   agreement with Mr. Fyfe and Mr. Carr and the FYFE CORPORATE DEFENDANTS,

26   whereby INSITUFORM had agreed to acquire the shares of the FYFE CORPORATE

27   DEFENDANTS for **$115,786,000.00**.

28   40.  On August 24, 2011, unbeknownst to DEFENSTECH and its other

Fyfe - p-complaint 01-23-13.wpd                    11

1   shareholders, Mr. Fyfe and INSITUFORM caused FYFE GROUP to assign the 212

2   Patent to FYFE BETA, without right or color of right, and in direct contravention of

3   federal law. (Exhibit "E" - USPTO Patent Assignment History.)

4        41.  On the very next day on August 25, 2011, Mr. Fyfe and INSITUFORM caused

5   FYFE BETA to transfer and assign the 212 Patent back to DEFENSTECH. (Exhibit "E" -

6   USPTO Patent Assignment History.)

7        42.  On August 30, 2011, Mr. Fyfe and INSITUFORM also caused FCLP to

8   transfer and assign the 212 Patent back to DEFENSTECH. (Exhibit "E" - USPTO Patent

9   Assignment History.)

10       43.  On August 31, 2011, INSITUFORM announced that it had closed its

11  acquisition agreement with Mr. Fyfe and Mr. Carr and the FYFE CORPORATE

12  DEFENDANTS to acquire the shares of the FYFE CORPORATE DEFENDANTS for

13  $115,786,000.00 (Exhibit "F" - SEC Form 8-K filed on August 31, 2011).

14       44.  On October 25, 2011, INSITUFORM announced in their SEC filing the

15  completion of an internal reorganization whereby a new Delaware parent holding

16  company, AEGION CORPORATION ("AEGION"), had been created to provide

17  corporate and administrative services for its operating subsidiaries (Insituform

18  Technologies, The Bayou Companies, Corrpro Companies, United Pipeline Systems,

19  CRTS, Fibrwrap Construction Services and Fyfe). In the new structure, AEGION

20  replaces INSITUFORM as the public company, and INSITUFORM and its former direct

21  subsidiaries are now direct subsidiaries of AEGION.

22       45.  *It is important to note that during the August 24, 2011, August 25, 2011, and*

23  *August 30, 2011 assignment transactions, the same law firm (Senniger Powers, LLP in*

24  *St. Louis, Missouri where AEGION is headquartered) which represents AEGION is*

25  *also the same law firm which prepared these assignments through the USPTO.*

26       46.  The above are five (5) separate criminal violations of 18 U.S.C Section 1001

27

28

1   and/or 37 C.F.R. Section 11.18(b)[2] and were unequivocally committed by ALL

2   Defendants. Defendants cannot even claim the infringements were accidental, as these

3   actions were all pre-meditated over the course of two years in order for ALL

4   DEFENDANT's to sell the FYFE CORPORATE DEFENDANTS for $115,786,000.

5   **MR. FYFE'S FRAUD IS DISCOVERED**

6       47.  On or about March 1, 2012, Mr. Fyfe contacted Mr. Sporn by telephone to

7   inquire if DEFENSTECH was doing anything with the 212 Patent. Mr. Sporn informed

8   Mr. Fyfe that DEFENSTECH was considering pursuing legal action against those who

9   may have been infringing upon Plaintiff's 212 Patent. Surprisingly, Mr. Fyfe replied, *"If*

10  *you sue anyone, you will cause me to have a serious problem as I sold my company last*

11  *year to a public company."* Mr. Fyfe became angry and stated *"I OBJECT to you suing*

12  *anyone as this will cost me a great deal of money as I licensed the Patent to other third*

13  *parties!"* Mr. Fyfe further stated that he had the right to re-purchase the Patent and that he

14  wanted to meet in person to discuss this but was advised by his attorney not to meet with

15  Mr. Sporn. This conversation was memorialized in an email sent by Mr. Fyfe to Mr.

16  Sporn and his attorney on May 16, 2012 at 9:01 AM PDT which stated *"Dear Alan, My*

17  *lawyer suggested that it would not be good to meet just now. Ed fyfe."*

18      48.  In response to Mr. Fyfe's comments, Mr. Sporn responded that

19  DEFENSTECH was working on potentially large contracts that utilize the patent and that

20  DEFENSTECH's intellectual property must be protected especially after hearing Mr.

21  Fyfe's revelations during his numerous telephone calls to Mr. Sporn.

22      49.  Throughout the next few days, Mr. Sporn received numerous telephone calls,

23  offers to meet in person and voice mails[3] from Mr. Fyfe on March 1, 3, 5, and 6.  During

24  the last call from Mr. Fyfe, he stated, "I resigned from the Board of Directors of

25  DEFENSTECH last year" and "if you proceed with ANY litigation, **THIS MEANS**

26  ─────────────────────

27  [2]which carries the possibility of fines and imprisonment of not more than five (5) years.

28  [3]Plaintiff retains copy of the phone messages left on Mr. Sporn's phone by Mr. Fyfe.

Fyfe - p-complaint 01-23-13.wpd                    13

1    WAR!"

2        50.  After several conversations with Mr. Fyfe, Mr. Sporn became suspicious as to

3    why Mr. Fyfe was concerned as to what DEFENSTECH was doing with the 212 Patent it

4    had acquired from Mr. Fyfe. Mr. Sporn ultimately learned that Mr. Fyfe sold his

5    companies to the publicly traded company AEGION and INSITUFORM for a total

6    acquisition price of approximately $115.8 million, while still a board member of

7    DEFENSTECH at all material times, with $10,000,000 held back in escrow for any

8    claims without ever disclosing to DEFENSTECH of any possible conflict of interest.

9        51.  Shortly thereafter, Mr. Sporn was also shocked to learn that DEFENSTECH's

10   patent assignment was fraudulently changed at the USPTO on no less than five (5)

11   separate times, as follows:

12           a.       September 23, 2009 – Assignors: Hexcel-Fyfe Co., LLC, Edward

13                    Robert Fyfe – Assignee: Fibrwrap Construction, L.P. (a Fyfe owned

14                    company)

15           b.       September 23, 2009 – Assignors: Fibrwrap Construction, L.P. –

16                    Assignee: Fyfe Group, LLC (a Fyfe owned company)

17           c.       August 24, 2011 - Assignors: Fyfe Group, LLC – Assignee: Fyfe

18                    Beta, Inc. (a Fyfe owned company)

19           d.       August 25, 2011 - Assignors: Fyfe Beta, Inc. – Assignee:

20                    DefensTech International, Inc.

21           e.       August 30, 2011 - Assignors: Fibrwrap Construction, L.P. –

22                    Assignee: DefensTech International, Inc.

23           (Exhibit "E" - USPTO Patent Assignment History.)

24       52.  At all material times, the **ONLY** person authorized to make any filings at the

25   USPTO for the 212 Patent would have been Mr. Sporn, the Chief Executive Officer,

26   President and majority shareholder of DEFENSTECH. In addition, Mr. Fyfe KNEW that

27   Mr. Sporn holds a UCC lien on all of DEFENSTECH's assets and Patent, by way of the

28   Unanimous Written Consent of the Board of Directors of DefensTech signed by Mr. Fyfe

1   on September 27, 2007, in his capacity as Director of Plaintiff.

2       53.  Without question, Plaintiff was unaware that Mr. Fyfe, the FYFE OFFICERS

3   AND FYFE CORPORATE DEFENDANT's and Aegion had made any filings at the

4   USPTO, and they did so without Plaintiff's knowledge or consent. More alarming is that

5   the five (5) times Defendants made falsified filings at the USPTO, Defendants committed

6   five (5) separate violations of 18 U.S.C Section 1001 and/or 37 C.F.R. Section 11.18(b).

7   **FIRST CAUSE OF ACTION**

8   **FRAUDULENT MISREPRESENTATION**

9   **(Against Mr. Fyfe, Mr. Carr, FYFE OFFICER's, FYFE CO, FYFE**

10   **ENTERPRISES, and Does 1-100)**

11       54.  Plaintiff hereby incorporates by reference each and every one of the preceding

12   paragraphs as if the same were fully set forth herein.

13       55.  During the negotiations to purchase the 212 Patent in late August or early

14   September of 2005, Mr. Fyfe, on behalf of himself and his entities, FYFE CO and FYFE

15   ENTERPRISES, represented to DEFENSTECH that Mr. Fyfe had never used the 212

16   Patent in the manner proposed by DEFENSTECH and did not intend to use the Patent for

17   Blast Mitigation or Ballistic Projectile Armor, but that FYFE wanted to obtain a license

18   back from DEFENSTECH allowing use of the Patent process in the ordinary course of his

19   current business.[4]

20   Mr. Sporn agreed to this condition and allowed Mr. Fyfe and FYFE CO to have a license

21   to utilize the 212 Patent ONLY after Mr. Fyfe assured Mr. Sporn that he wanted to be

22   involved in DEFENSTECH to help the company grow and for the 212 Patent to be

23   utilized in blast mitigation and as part of a process for producing personal protection

24   products, and bullet and blast proofing of police vehicles, and his sole purpose of the

25   license back, was as above mentioned. Such representations were false and untrue as

26

27   _____

28   [4]as evidenced in Section 4, together with Section 9 of the Agreement for Purchase and
Sale of Patent.

1 Defendants, especially Mr. Fyfe, continued to utilize, assign, and license the 212 Patent to

2 third parties without Plaintiff's consent or authorization and without right or color of

3 right.

4      56. On or about September 10, 2005, Mr. Fyfe, FYFE CO, and Mr. Sporn, on

5 behalf of DEFENSTECH, entered into an Agreement for Purchase and Sale of the "212

6 Patent" (hereinafter the "Agreement"). (Exhibit "B" - Patent Purchase & Sale

7 Agreement.) By making such false representations upon which Plaintiff justifiably relied,

8 Plaintiff provided Mr. Fyfe, as consideration, with a cashier's check for $75,000 and two

9 million shares of DEFENSTECH, which accounted for twenty percent (20%) of the

10 company. In further reliance of Mr. Fyfe's specific promises and representations, Plaintiff

11 obtained financing and spent approximately $4,000,000.00 to hire staff, consultants,

12 conduct considerable research, purchase materials, and product development in order to

13 penetrate the market in reliance of the integrity of the 212 Patent. Mr. Fyfe was also made

14 a Director of DEFENSTECH at his request and remained so until the late part of 2011

15 when he purportedly resigned from his position as director of DEFENSTECH, months

16 after he secretly transacted with INSITUFORM to sell his entities, the FYFE

17 CORPORATE DEFENDANTS, for $115,786,000.00, without ever disclosing to

18 DEFENSTECH.

19      57. Defendants, especially Mr. Fyfe, knew or should have known, that at the time

20 the representations were made to facilitate the sale of the 212 Patent and receive monies

21 and shares of DEFENSTECH, such representations were false and material. In fact,

22 Defendants knew that they were going to continue to utilize, assign, and license the 212

23 Patent to third parties without Plaintiff's consent or authorization and in direct

24 contravention of the Agreement and the promises and representations made by Mr. Fyfe.

25 Had Plaintiff been made aware of Defendants' true intentions, Plaintiff would have never

26 invested the significant sums of money to move forward with its business projects relating

27 to the 212 Patent.

28      58. Plaintiff, as a direct and proximate result of his reliance on Defendants'

1   misrepresentations and concealment, has been injured in an amount to be determined at

2   trial but believed to be in excess of $25,000,000.00.

3       59.  The conduct of Defendants, and each of them, as herein described, was so

4   vile, base, contemptible, miserable, wretched and loathsome that it would be looked down

5   upon and despised by ordinary people.  Plaintiff is therefore entitled to punitive damages

6   in an amount appropriate to punish defendants and to deter others from engaging in

7   similar conduct.

## SECOND CAUSE OF ACTION

### FRAUDULENT CONCEALMENT

### (Against Mr. Fyfe and Mr. Carr, FYFE CO, FYFE ENTERPRISES,

### and Does 1-100)

12      60.  Plaintiff hereby incorporates by reference each and every one of the preceding

13  paragraphs as if the same were fully set forth herein.

14      61.  After selling the 212 Patent to Plaintiff, Mr. Fyfe became a 20% minority

15  shareholder of DEFENSTECH and a board director. As such, Mr. Fyfe owed a fiduciary

16  duty to Plaintiff and its shareholders and breached such duty by deliberately attempting to

17  conceal the following facts:

18          a.      On December 23, 2009, unbeknownst to DEFENSTECH and its

19                  other shareholders, Mr. Fyfe and his entity, HEXCEL-FYFE,

20                  fraudulently assigns the 212 Patent to FCLP as indicated on the

21                  United States Patent and Trademark Office (hereinafter "USPTO").

22                  (Exhibit "E" - USPTO Patent Assignment History.)

23          b.      On the very same date on December 23, 2009, unbeknownst to

24                  DEFENSTECH and its other shareholders, Mr. Fyfe caused FCLP to

25                  fraudulently assign the 212 Patent to FYFE GROUP.  (Exhibit "E" -

26                  USPTO Patent Assignment History.)

27          c.      As of July 26, 2011, Mr. Fyfe had entered into negotiations to sell

28                  his companies to INSITUFORM stating the "212 Patent" was part of

1        the sale..

2        d.     On July 27, 2011, INSITUFORM announced that it had entered into

3                an agreement with Mr. Fyfe and the FYFE CORPORATE

4                DEFENDANTS, whereby INSITUFORM had agreed to acquire the

5                shares of the FYFE CORPORATE DEFENDANTS for

6                $115,786,000.00.

7        e.     On August 24, 2011, unbeknownst to DEFENSTECH and its other

8                shareholders, Mr. Fyfe and INSITUFORM caused FYFE GROUP to

9                fraudulently assign the 212 Patent to FYFE BETA.  (Exhibit "E" -

10              USPTO Patent Assignment History.)

11      f.     On the very next day on August 25, 2011, Mr. Fyfe and

12             INSITUFORM caused FYFE BETA to transfer and assign the 212

13             Patent back to DEFENSTECH. (Exhibit "E" - USPTO Patent

14             Assignment History.)

15      g.    On August 30, 2011, Mr. Fyfe and INSITUFORM also caused FCLP

16             to transfer and assign the 212 Patent back to DEFENSTECH.

17             (Exhibit "E" - USPTO Patent Assignment History.)

18     62.  From December 23, 2009 through August 30, 2011, Plaintiff further alleges

19 that Defendants continued to utilize, assign, and license the 212 Patent to third parties

20 without Plaintiff's consent or authorization and reaped gains at the detriment of Plaintiff.

21 At no time did Mr. Fyfe ever disclose this material fact, which was concealed so that he

22 would continue to benefit at the expense of DEFENSTECH.

23     63.  Plaintiff was unaware of such facts and actions taken by Defendants.

24 Furthermore, Defendants intended to deceive Plaintiff by concealing such facts and

25 actions.

26     64.  The Defendants, and each of them, directly or through their agents and

27 employees violated California *Civil Code* Section 1709, Section 1710, and Section 1711,

28 and are liable for deceit.

1   65. The Defendants, and each of them, directly or through their agents and

2   employees:

     a.    made representations, as a fact, which were not true and Defendants,

4       and each of them did not believe it to be true at the time made, in

5       violation of Section 1710(1);

6       b.    suppressed facts, which they were bound to disclosure, or gave

7       information of other facts which were likely to mislead for want of

8       communications of suppressed facts, in violation of Section 1710(3);

9       and

10      c.    made promises without any intention of performing it, in violation of

11      Section 1710(4).

12  66. Plaintiff, as a direct and proximate result of his reliance on Defendants'

13  misrepresentation and concealment, has been injured in an amount to be determined at

14  trial but believed to be in excess of $25,000,000.00.

15  67. The conduct of Defendants, and each of them, as herein described, was so

16  vile, base, contemptible, miserable, wretched and loathsome and pre-meditated that it

17  would be looked down upon and despised by ordinary people. Plaintiff is therefore

18  entitled to punitive damages in an amount appropriate to punish defendants and to deter

19  others from engaging in similar conduct.

20  **THIRD CAUSE OF ACTION**

21  **BREACH OF FIDUCIARY DUTY**

22  **(Against Mr. Fyfe and Does 51 – 100)**

23  68. Plaintiff hereby incorporates by reference each and every one of the preceding

24  paragraphs as if the same were fully set forth herein.

25  69. As Plaintiff's board director and minority shareholder, Mr. Fyfe owed

26  fiduciary duties to Plaintiff. These fiduciary duties include the following, among others:

27      a.    a duty to properly disclose all transactions and business dealings that

28      may have an adverse effect on Plaintiff's line of business;

    b.      a duty not to usurp any of Plaintiff's corporate opportunities;

    c.      a duty not to infringe or assist others to infringe upon Plaintiff's 212 Patent;

    d.      a duty to look after the well-being and financial stability of Plaintiff; and

    e.      a duty to not to harm Plaintiff and its other shareholders.

70. These duties also include a prohibition of committing fraud against or such that is attributed to Plaintiff without Plaintiff's knowledge.

71. Mr. Fyfe and his entities, jointly and severally, are liable for damages which have in fact been suffered by Plaintiff because they, and each of them, conspired and did in fact cause harm to Plaintiff by assigning and licensing the 212 Patent to third parties without Plaintiff's consent or authorization. Said Defendants further failed to advise and disclose to Plaintiff the various fraudulent and felonious assignments at the USPTO.

72. As a direct and proximate result of Defendants, jointly and severally, breaching their fiduciary duties to Plaintiff, Plaintiff has suffered damages in an amount to be proven at trial but in any case more than the sum of $25,000,000.00 and Plaintiff is entitled to recover its damages from said Defendants.

73. The conduct of Defendants, and each of them, as herein described, was so vile, base, contemptible, miserable, wretched and loathsome and pre-meditated that it would be looked down upon and despised by ordinary people. By Mr. Fyfe's admission of competing, as mentioned above, Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish defendants and to deter others from engaging in similar conduct.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Mr. Fyfe, FYFE CO, and Does 51 - 100)

74. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

75.  On September 10, 2005, Mr. Fyfe, FYFE CO, and Mr. Sporn, on behalf of DEFENSTECH, entered into an Agreement for Purchase and Sale of the "212 Patent" (hereinafter the "Agreement").  (Exhibit "B" - Patent Purchase & Sale Agreement.) Pursuant to the terms of the Agreement, Mr. Fyfe was given a cashier's check for $75,000 and two million shares of DEFENSTECH, which accounted for twenty percent (20%) of the company. As a material term to the Agreement, Defendants were selling, assigning, and transferring ALL of its "right, title and interest in and to the Patent" to Plaintiff.

76.  During all times relevant herein, it was explicitly understood and agreed orally, and in writing, that Plaintiff would have the sole rights and ownership to the "212 Patent". Furthermore, it was explicitly understood and agreed that Defendants would not sell or assign the rights to the "212 Patent" to any third parties without Plaintiff's consent. Common sense logic of Mr. Fyfe, as a Director of DEFENSTECH, together with sections 4 and 9 of the Patent Purchase Agreement, certainly confirm he would not compete with DEFENSTECH.

77. Plaintiff has performed all conditions, covenants, duties, and promises required by it, on its part, to be performed in accordance with the terms and conditions of the Agreement between the parties. However, Defendants, and each of them, have breached the terms and conditions of these agreements by deliberately and intentionally assigning the "212 Patent" to various entities controlled and operated by Mr. Fyfe in his willful and deliberate efforts to obtain ill-begotten revenues at the expense and detriment to Plaintiff.

78.  As a direct and proximate result of this breach by Defendants, Does 1-20, and each of them, Plaintiff has sustained damages in an amount to be proven at trial, but believed to be in excess of $25,000.000.00.

79.  Furthermore, Plaintiff is not only entitled to the damages it sustained as a result of Defendants' failure and/or refusal to pay, but is also entitled to the maximum prejudgment interest allowed under California *Civil Code* section 3289, and/or any other applicable provision providing for prejudgment interest.

80.  Plaintiff is further entitled to recover its reasonable attorneys' fees incurred to

COMPLAINT

1  enforce the terms of the written agreement between the parties.

2  ### FIFTH CAUSE OF ACTION

3  ### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

4  ### & FAIR DEALING

5  ### (Against Mr. Fyfe and Mr. Carr, FYFE CO, and Does 51 - 100)

6  81. Plaintiff hereby incorporates by reference each and every one of the preceding

7  paragraphs as if the same were fully set forth herein.

8  82. There is implied in every contract a covenant by each party not to do anything

9  which will deprive the other party thereto of the benefits of the contract. This covenant

10  not only imposes upon each contracting party the duty to refrain from doing anything

11  which would render the performance of the contract impossible by any act of his/her/their

12  own, but also to do everything that the contract presupposes will be done to accomplish

13  the purpose of the contract.

14  83. By acting in the manner herein alleged, Defendants, Does 51-100, and each of

15  them, breached this implied covenant of good faith and fair dealing as clearly stated

16  above in the promises made by Mr. Fyfe, and in section 4 of the Patent Purchase & Sale

17  Agreement, together with the above referenced breaches and obvious transfers.

18  84. As a direct and proximate result of Defendants' breach, as alleged herein,

19  Plaintiff has been damaged in the manner set forth above and in a sum to be proven at

20  trial, but believed to be in excess of $25,000,000.00. In addition to this amount, Plaintiff

21  further seeks the maximum prejudgment interest allowed under California *Civil Code*

22  section 3289, and/or any other applicable provision providing for prejudgment interest.

23  85. Plaintiff is further entitled to recover its reasonable attorneys' fees incurred to

24  enforce the terms of the written agreement between the parties.

25  ### SIXTH CAUSE OF ACTION

26  ### DECLARATORY RELIEF

27  ### (Against all Defendants and Does 51-100)

28  86. Plaintiff hereby incorporates by reference each and every one of the preceding

1  paragraphs as if the same were fully set forth herein.

2       87. An actual controversy has arisen and now exists between the Plaintiff and

3  Defendants, and Does 51-100, and each of them, concerning their respective rights vis-a-

4  vis the Agreement.

5       88. Plaintiff contends that it is the sole owner of the 212 Patent and that no one

6  else has any rights to utilize the Patent without Plaintiff's consent.  Defendants dispute

7  these contentions and contend that the Agreement grants Mr. Fyfe and his entities a

8  license to utilize 212 Patent.

9       89. Plaintiff desires a judicial determination of their rights and duties, and a

10 declaration as to rights and obligations pursuant to the terms of the Agreement.

11      90. A judicial declaration is necessary and appropriate at this time under the

12 circumstances so that the parties herein may ascertain their rights and duties as to the 212

13 Patent, together with a complete forensic accounting and disgorgement, based on profits

14 made in the event we are correct.

15              **SEVENTH CAUSE OF ACTION**

16      **(DISREGARD OF CORPORATE FICTION against Mr. Fyfe, Mr. Carr**

17              **and the FYFE CORPORATE DEFENDANTS)**

18      91. Plaintiff refers to and re-alleges the statements contained in the preceding

19 paragraphs and incorporates them here by reference as though the same were set forth in

20 full herein.

21      92. Plaintiff is informed and believes and thereon alleges that Mr. Fyfe and Mr.

22 Carr operated the FYFE CORPORATE DEFENDANTS in such a manner and with such

23 unity of interest and ownership that each of the FYFE CORPORATE DEFENDANTS

24 was the alter ego of Mr. Fyfe and that the acts of the FYFE CORPORATE

25 DEFENDANTS were the acts of Mr. Fyfe. Plaintiff is further informed and believes and

26 thereon alleges that Mr. Fyfe is liable for the acts of the FYFE CORPORATE

27 DEFENDANTS alleged in this Complaint as the alter ego of the FYFE CORPORATE

28 DEFENDANTS. Recognition of the privilege of separate existence would promote

COMPLAINT

1   injustice because Mr. Fyfe and Mr. Carr in bad faith dominated and controlled the FYFE

2   CORPORATE DEFENDANTS as follows:

3   a) Mr. Fyfe commingled funds and other assets of the FYFE

4     CORPORATE DEFENDANTS and their funds and other assets for

5     his convenience and to assist in evading disclosure obligations and

6     payment of obligations;

7   b) Mr. Fyfe diverted funds and other assets of the FYFE CORPORATE

8     DEFENDANTS to other corporate uses;

9   c) Mr. Fyfe treated the assets of the FYFE CORPORATE

10     DEFENDANTS as his own;

11   d) Mr. Fyfe failed to maintain minutes or adequate corporate records;

12   e) Mr. Fyfe used each of the FYFE CORPORATE DEFENDANTS as a

13     mere shell, instrumentality, or conduit for a business of an individual

14     or another corporation;

15   f) Mr. Fyfe diverted assets from the FYFE CORPORATE

16     DEFENDANTS to himself to the detriment of creditors; and

17   g) Each of the FYFE CORPORATE DEFENDANTS were severely

18     undercapitalized.

19  93. At all times relevant herein, there existed such a unity of interest, control, and

20   ownership between Mr. Fyfe, Mr. Carr and the FYFE CORPORATE DEFENDANTS

21   that any individuality and separateness between Mr. Fyfe, Mr. Carr and the FYFE

22   CORPORATE DEFENDANTS have ceased, and each of the FYFE CORPORATE

23   DEFENDANTS became the alter ego of Mr. Fyfe and Mr. Carr.

24  94. Said control, domination, and operation of the FYFE CORPORATE

25   DEFENDANTS by said individual Defendants was and is such that their individual

26   business was carried out without the holding of legally convened directors' or

27   shareholders' meeting. Plaintiff is informed and believes and thereon alleges that no bona

28   fide records or minutes of any validly held corporate proceedings were maintained, and

1  said individual Defendant entered into personal transactions with the FYFE

2  CORPORATE DEFENDANTS without the valid or proper approval of directors or

3  shareholders.

4      95.  Adherence to the fiction of the separate existence of each of the FYFE

5  CORPORATE DEFENDANTS as an identity distinct from said individual Defendant

6  would permit an abuse of the corporate privilege and would promote injustice in that such

7  corporate formalities were never adhered.

8                     **EIGHTH CAUSE OF ACTION**

9                **(MISAPPROPRIATION OF TRADE SECRETS)**

10      **(By Plaintiff against Mr. Fyfe, Mr. Carr and the FYFE CORPORATE**

11                     **DEFENDANTS, and Does 1-100)**

12     96.  Plaintiff refers to and re-alleges the statements contained in the preceding

13  paragraphs and incorporates them here by reference as though the same were set forth in

14  full herein.

15     97.  California *Civil Code* § 3426.1(d) defines trade secret as "information,

16  including a formula, pattern, compilation, program, device, method, technique, or

17  process, that: (1) Derives independent economic value, actual or potential, from not being

18  generally known to the public or to other persons who can obtain economic value from its

19  disclosure or use; and (2) Is the subject of efforts that are reasonable under the

20  circumstances to maintain its secrecy."

21     98.  Pursuant to Cal. *Civ. Code* § 3426.1(b), a person misappropriates a trade

22  secret if: (1) he or she discloses or uses another's trade secret without the consent of the

23  owner of that trade secret, and (2) at the time of use or disclosure, "knew or had reason to

24  know that his or her knowledge of the trade secret was acquired under circumstances

25  giving rise to a duty to maintain its secrecy or limit its use."  Cases interpreting this

26  statute have consistently held that a former employee's use or disclosure of her former

27  employer's protected customer information to solicit business from those customers

28  constitutes misappropriation of a trade secret. *Morlife, Inc. v. Perry* (1997) 56 Cal. App.

1  4th 1514, 1526.

2      99.  Through years of building, developing, and maintaining relationship with its

3  customers, Plaintiff alleges Defendants, through Mr. Fyfe, in connection with Mr. Fyfe's

4  position as a director of DEFENSTECH gained valuable confidential information which

5  they are now using to benefit their own business, all to Plaintiff's detriment. As an

6  example, AEGION is coincidently in the Blast Mitigation business as indicated on their

7  website at:

8  http://www.aegion.com/Commercial-and-Structural/Structural-Reinforcement/Blast%20

9  Mitigation.aspx

10      100. Plaintiff has been severely and irreparably damaged by the deliberate and

11  unlawful conduct by Defendants. Said Defendants' wrongful conduct has caused Plaintiff

12  to lose millions of dollars. Plaintiff has further been damaged by Defendants herein, and

13  each of them, in that Plaintiff has been forced to retain the services of an attorney and to

14  pay attorneys' fees and to institute legal action and for legal assistance in stopping the

15  ongoing misappropriation and unfair acts by Defendants.

16      101. Unless and until enjoined and restrained by order of this Court, said

17  Defendants threaten to and will continue to wrongfully utilize and steal Plaintiff's trade

18  secrets, thereby causing irreparable harm.

19      102.  The aforementioned acts of Defendants, and each of them, were willful and

20  malicious. Therefore, Plaintiff is entitled to exemplary or punitive damages.

21  **NINTH CAUSE OF ACTION**

22  **PATENT INFRINGEMENT**

23  **(Against all Defendants, and Does 1 - 100)**

24      103. Plaintiff hereby incorporates by reference each and every one of the preceding

25  paragraphs as if the same were fully set forth herein.

26      104.  United States Patent No. 6,806,212, entitled "Coating and Method for

27  Strengthening a Structure" was duly and legally issued by the USPTO on October 19,

28  2004 after full and fair examination. On said date, FYFE CO was the assignee of all

1    rights, title and interest in and to the 212 Patent.

2         105.  On September 10, 2005, Mr. Fyfe, FYFE CO, and Mr. Sporn, on behalf of

3    DEFENSTECH, entered into an Agreement for Purchase and Sale of the "212 Patent"

4    (hereinafter the "Agreement").  (Exhibit "B" - Patent Purchase & Sale Agreement.)

5    Pursuant to the terms of the Agreement and the subsequent assignment made with the

6    USPTO, DEFENSTECH became the assignee of all rights, title and interest in and to the

7    '212' Patent and possesses all rights of recovery under the 212 Patent, including the right

8    to sue for infringement and recover past damages.

9         106.  Upon information and belief, the above mentioned Defendants and each of

10   them have infringed, and is now directly infringing, inducing infringement by others,

11   and/or contributorily infringing one or more claims of the 212 Patent within this District

12   and elsewhere within the United States through its manufacturers, importation, sale,

13   offers to sell, or use of its methodology.

14        107.  Upon information and belief, the above mentioned Defendants have

15   practiced and continue to practice in the United States the method that is described in one

16   or more claims of the 212 Patent. As a result, Defendants have infringed and are

17   infringing the 212 Patent, owned solely by Plaintiff and no one else.

18        108.  Upon information and belief, the above mentioned Defendants' infringement

19   of the 212 Patent has been and continues to be objectively reckless, willful and wanton

20   with full knowledge and awareness of Plaintiff's patent rights.

21        109.  Plaintiff has been damaged in an amount to be determined at trial, but which

22   is no less than a reasonable royalty, and irreparably injured by Defendants' infringing

23   activities.  Plaintiff will continue to be so damaged and irreparably injured unless such

24   infringing activities are enjoined by this Court.

25        110.  Moreover, in light of the willful nature of Defendants' conduct, this case

26   should be deemed "exceptional" under the Patent Laws.  As a result, in addition to

27   damages, Plaintiff is entitled to enhanced damages and its attorneys' fees and costs

28   incurred herein.

## **TENTH CAUSE OF ACTION**

### **VIOLATION OF CAL. BUS. & PROF. CODE §17200 et seq.**

### **(Against All Defendants and Does 1 - 100 )**

111.   Plaintiff incorporates herein by reference the allegations made in preceding paragraphs as though fully set forth herein.

112.   California *Business & Professions Code* Section 17200, et seq., prohibits acts of unfair competition, which means and includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

113.  As more fully described above, Defendants' acts and practices are clearly unfair and likely to deceive, constituting a fraudulent business act or practice.  This conduct is ongoing and continues to this date.

114.  Specifically, as fully set forth above, Defendants engage in unfair business practices with respect to the misappropriation of trade secrets and infringement of the 212 Patent belonging solely to Plaintiff, as evidenced above.

115.  As stated herein, Defendants, and each of them, violated *Civ. Code* §3426.1(b) which states that a person misappropriates a trade secret if: (1) he or she discloses or uses another's trade secret without the consent of the owner of that trade secret, and (2) at the time of use or disclosure, "knew or had reason to know that his or her knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." This is confirmed by Mr. Fyfe's own statements to Mr. Sporn, as stated above.

116.  Furthermore, by filing false documents with the USPTO that are knowlingly false, Defendants have violated 18 U.S.C § 1001 and/or 37 C.F.R. § 11.18(b), which carries the possibility of fines and imprisonment of not more than five (5) years.

117.  Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, Defendants have violated both state and federal laws and regulations and said predicate acts are therefore per se violations of California *Business and Professions Code* Section 17200, et seq.

1    118.  Plaintiff alleges that Defendants' misconduct, as alleged herein, gave, and

2  have given, Defendants an unfair competitive advantage over Plaintiff and Defendants'

3  competitors.

4    119.  Plaintiff alleges that as direct and proximate result of the aforementioned

5  acts, Defendants have prospered and benefitted from Plaintiff by stealing Plaintiff's

6  customers and agents, which Plaintiff has spent a considerable amount of time, money,

7  and labor to develop and maintain.

8    120.  By reason of the foregoing, Defendants have been unjustly enriched and

9  should be required to disgorge their illicit profits and/or make restitution to Plaintiff

10  and/or be enjoined from continuing in such practices pursuant to California *Business &*

11  *Professions Code* Sections 17203 and 17204.  Additionally, Plaintiff is therefore entitled

12  to injunctive relief and attorney's fees as available under California *Business and*

13  *Professions Code* Sec. 17200 and related sections.

14                                      **PRAYER**

15    **WHEREFORE**, Plaintiff, DEFENSTECH INTERNATIONAL, INC., prays for

16  judgment against Defendants, and each of them, as follows:

17  **ON THE FIRST CAUSE OF ACTION:**

18    1.    For special damages according to proof;

19    2.    For compensatory damages according to proof in an amount to be

20          determined at trial but believed to be in excess of $25,000,000.00;

21    3.    For punitive and exemplary damages according to proof;

22    4.    For prejudgment interest thereon at the legal rate pursuant to California

23          *Civil Code* sections 3288, 3289, and/or any other applicable provision

24          providing for prejudgment interest

25  **ON THE SECOND CAUSE OF ACTION:**

26    1.    For special damages according to proof;

27    2.    For compensatory damages according to proof in an amount to be

28          determined at trial but believed to be in excess of $25,000,000.00;

3.     For punitive and exemplary damages according to proof;

4.     For prejudgment interest thereon at the legal rate pursuant to California *Civil Code* sections 3288, 3289, and/or any other applicable provision providing for prejudgment interest

**ON THE THIRD CAUSE OF ACTION:**

1.     For special damages according to proof;

2.     For compensatory damages according to proof in an amount to be determined at trial but believed to be in excess of $25,000,000.00;

3.     For punitive and exemplary damages according to proof.

4.     For prejudgment interest thereon at the legal rate pursuant to California *Civil Code* sections 3288, 3289, and/or any other applicable provision providing for prejudgment interest

**ON THE FOURTH CAUSE OF ACTION:**

1.     For special damages according to proof;

2.     For compensatory and consequential damages according to proof in an amount to be determined at trial but believed to be in excess of $25,000,000.00;

3.     For reasonable attorneys' fees pursuant to written agreement between the parties.

4.     For prejudgment interest thereon at the legal rate pursuant to California *Civil Code* sections 3288, 3289, and/or any other applicable provision providing for prejudgment interest

**ON THE FIFTH CAUSE OF ACTION:**

1.     For special damages according to proof;

2.     For compensatory damages according to proof in an amount to be determined at trial but believed to be in excess of $25,000,000.00;

3.     For punitive and exemplary damages according to proof.

4.     For prejudgment interest thereon at the legal rate pursuant to California

1    *Civil Code* sections 3288, 3289, and/or any other applicable provision

2    providing for prejudgment interest

3    **ON THE SIXTH CAUSE OF ACTION:**

4    1.    For an order finding that Defendants have no legally cognizable rights as to

5          the 212 Patent;

6    2.    For a declaration from this Court that Defendants have no legally

7          cognizable rights as to the 212 Patent;

8    3.    For disgorgement of profits;

9    4.    For reasonable attorneys' fees pursuant to written agreement between the

10         parties.

11   **ON THE SEVENTH CAUSE OF ACTION:**

12   1.    For an order that the FYFE CORPORATE DEFENDANTS are the alter

13         ego's of the individual Defendant's, EDWARD ROBERT FYFE and

14         HEATH CARR, and said Defendant's are liable to Plaintiff for damages

15         arising from the acts and omissions of the FYFE CORPORATE

16         DEFENDANTS.

17   **ON THE EIGHTH CAUSE OF ACTION:**

18   1.    For an order requiring Defendants to show cause, if any, why they should

19         not be enjoined, as hereinafter set forth, during the pendency of this action;

20   2.    For a temporary restraining order, a preliminary injunction, and a permanent

21         injunction, all enjoining Defendants and their agents, servants, and

22         employees, and all persons acting under, in concert with, or for them, from

23         continuing to utilize and disclosing Plaintiff's trade secrets to other third

24         parties;

25   3.    For prejudgment interest thereon at the legal rate pursuant to California

26         *Civil Code* sections 3288, 3289, and/or any other applicable provision

27         providing for prejudgment interest;

28   4.    For punitive and exemplary damages according to proof.

**ON THE NINTH CAUSE OF ACTION:**

1. That Defendants, their officers, directors, agents, servants, employees, and all persons and entities in active concert or participation with them, or any of them, be preliminarily and permanently enjoined and restrained from further infringement of the 212 Patent;

2. For Judgment by the Court that Defendants have infringed and are infringing the 212 Patent;

3. An award of damages for infringement of the 212 Patent, in an amount to be determined at trial but believed to be in excess of $25,000,000.00, together with prejudgment interest and costs, said damages to be trebled by reason of the intentional and willful nature of Defendants' infringement, as provided by 35 U.S.C. § 284;

4. An award of Plaintiff's reasonable attorneys' fees pursuant to 35 U.S.C. § 285 in that this is an exceptional case;

5. For exemplary and punitive damages according to proof;

**ON THE TENTH CAUSE OF ACTION:**

1. Pursuant to *Business and Professions Code* § 17203, that all Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition in violation of § 17200, including, but not limited to, the violations alleged herein;

2. For civil penalties pursuant to statute, restitution, injunctive relief and reasonable attorney's fees according to proof;

3. For restitution of any money or property Defendants wrongfully obtained, pursuant to *Business and Professions Code* § 17203;

4. For reasonable attorney's fees and costs.

1    **AS TO ALL CAUSES OF ACTION:**

2    1.    For costs of suit incurred herein;

3    2.    For such other and further relief as the court may deem proper.

4

5

6    DATED: January 23, 2013        **GARCIA & PHAN, A Prof. Law Corp.**

7

8

9

10    By _____
    ROBERT N. PHAN

11    Attorneys for Plaintiff,
    DEFENSTECH INTERNATIONAL, INC.

12

13    DATED: January 23, 2013        **RHEMA LAW GROUP, P.C.**

14

15

16    By /s/ John D. Tran
    _____

17    JOHN D. TRAN
    Attorneys for Plaintiff,

18    DEFENSTECH INTERNATIONAL, INC.

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR TRIAL BY JURY

2

3

Plaintiff hereby requests that this matter be tried before a jury.

4

DATED: January 23, 2013

**GARCIA & PHAN, A Prof. Law Corp.**

5

6

7

8

By_____

ROBERT N. PHAN
Attorneys for Plaintiff,
DEFENSTECH INTERNATIONAL, INC.

9

10

DATED: January 23, 2013

**RHEMA LAW GROUP, P.C.**

11

12

13

14

By___/s/ John D. Tran_____

JOHN D. TRAN
Attorneys for Plaintiff,
DEFENSTECH INTERNATIONAL, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fyfc - p-complaint 01-23-13.wpd

34

COMPLAINT

# EXHIBIT "A"



US006806212B2

| (12) | **United States Patent** | (10) Patent No.: | **US 6,806,212 B2** |
|---|---|---|---|
| | Fyfe | (45) Date of Patent: | **Oct. 19, 2004** |

(54) **COATING AND METHOD FOR STRENGTHENING A STRUCTURE**

(75) Inventor: **Edward R. Fyfe**, Del Mar, CA (US)

(73) Assignee: **Fyfe Co., LLC**

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 9 days.

(21) Appl. No.: **10/072,677**

(22) Filed: **Feb. 7, 2002**

(65) **Prior Publication Data**

US 2003/0148681 A1 Aug. 7, 2003

(51) Int. Cl.⁷ .......................... **B32B 27/12; B32B 27/04**
(52) U.S. Cl. ........................ **442/104;** 442/65; 442/134; 442/136; 442/164; 442/168; 442/169; 442/172; 442/179; 442/180; 52/309.1; 52/454
(58) Field of Search .......................... 442/65, 104, 134, 442/164, 169, 168, 172, 179, 180, 136; 52/454, 309.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,488,912 A | * | 2/1996 | Pileggi et al. | .............. | 105/422 |
| 5,649,398 A | | 7/1997 | Isley, Jr. et al. | .............. | 52/309 |
| 5,657,595 A | | 8/1997 | Fyfe et al. | .................... | 52/252 |

* cited by examiner

*Primary Examiner*—Ula C. Ruddock
(74) *Attorney, Agent, or Firm*—Mary Jo Redman; Calif Tervo

(57) **ABSTRACT**

Composite coating (10) improves the resistance to blast or seismic forces of a structure (100), such as wall (101). Coating (10) includes a first layer (20) of elastomeric polyurethane in contact with and adhering to wall (101), a second layer (30) of elastomeric polyurethane in contact with and adhering to first layer (20), and a layer of textile (40) embedded between first layer (20) and second layer (30).

**8 Claims, 1 Drawing Sheet**



**U.S. Patent**         Oct. 19, 2004         US 6,806,212 B2



FIG. 1

FIG. 2

US 6,806,212 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# COATING AND METHOD FOR STRENGTHENING A STRUCTURE

## FIELD OF THE INVENTION

This invention relates in general to strengthening a structure, and more specifically to a composite coating that can be applied to an existing structure in the field to increase its strength and resistance to explosive, seismic, or other forces.

## BACKGROUND OF THE INVENTION

Structures that must bear great weight, such as pillars, walls, or bridge spans, are often constructed from concrete. Concrete is very strong under compression, so can support its own weight as well as the weight of other structural elements, people, vehicles, and equipment.

Concrete is not strong under tension, though, and is a brittle material. Iron reinforcing rods are often embedded in concrete to increase the overall tensile strength. Even reinforced concrete needs to be very thick to withstand the forces generated by a moderate or large explosion, such as can happen in a refinery, cereal mill, power plant, or chemical plant.

Explosion forces often radiate in all directions and may change directions during the course of the blast. Thus, the forces from an explosion are not necessarily along vectors where typical load forces were expected.

Earthquakes, too, can generate large lateral forces that change direction. Many existing structures are not strong enough to withstand a large earthquake and need to be strengthened to meet current standards of safety.

Other structures that may need to withstand extreme, violent forces are the piping and tanks for holding and transporting petroleum products and other potentially explosive chemicals. Because large weights are not supported, tanks and pipes are generally not made of concrete. They are more typically made of a metal, chosen to be unreactive with the contents, nonporous, and much more ductile than concrete, such as iron, steel, or copper. The ductility of metals makes them easy to form into complex shapes, but metals, unless very thick, are generally not greatly resistant to moderate explosions. Most metals are not nearly as brittle as concrete; however, they stretch under force and eventually rupture. Extreme heat, such as can be generated by an explosion or a resulting fire, weakens most metals.

Some structures, such as water storage tanks or airplane bulkheads, were not expected to require high strength when they were designed, but are later found to need strengthening, such as to harden them against deliberate attack with explosives.

Some technology exists for strengthening structures already built, such as wrapping bridge pillars with epoxy-impregnated fiberglass panels to make them less likely to collapse in an earthquake. Some large structures can have additional concrete sprayed onto their surfaces.

Another way of rendering a building more explosion-resistant is to pile sandbags against the walls or on the roof to absorb and diffuse the forces. This is used in wartime or when an explosion is expected, as at a bomb-testing site, but is impractical for routine use and does not lend itself to all structures.

In a laboratory that uses potentially explosive chemicals, barriers of thick polycarbonate or similar material are often erected around reaction vessels. Another strategy used in laboratories and chemical plants is to include an easily knocked-down wall or roof in the design of the building. Shields and blast walls protect the personnel outside them from blasts, but do nothing to confine the explosion reactants and products to their vessel. Fire, secondary explosions, and widespread chemical contamination are common after a chemical explosion in a lab or plant and often cause more property damage and casualties than the blast itself does.

There is an increasing need for a way to strengthen structures against explosion, seismic, and other forces other than by making them extremely thick and massive. Such a means should help the structure keep its integrity, at least long enough for persons to evacuate or for hazardous materials to be removed. Preferably, such a means is applicable to complex structures and to those already built and in use.

## SUMMARY OF THE INVENTION

The present invention is a composite coating that may be applied to many structures, such as buildings, bridges, storage tanks, airplane bulkheads, walls, columns, beams, and piping to increase their resistance to explosive, seismic, and other forces.

The composite consists of two layers of rubbery polymer, or elastomer, with a layer of textile embedded between the layers of elastomer. One preferred elastomer is polyurethane, which may be sprayed on as a blend of two precursor components. A mixing gun mixes the two components in the correct ratio so that the components mix in flight and begin to cure into rubbery polyurethane immediately.

A layer of mixed precursor is applied to the structure and a piece of textile is pressed onto the still tacky surface. The viscous fluid holds the textile in place. Another layer of mixed precursor is sprayed over the textile, covering it and bonding to the initial coat of polyurethane through the openings between the yarns. Each layer of cured polyurethane is in the range of 0.03 to 0.25 inch thick, with a maximum preferred total thickness of 0.5 inch. Interior corners are preferably radiused; a coving pre-cast from the same or compatible elastomer as the first and second layers may be glued into the corner to radius it before the first layer is sprayed.

The textile used is typically cloth woven of fiberglass, graphite fiber, or polyaramid (Kevlar). The textile may also be knit. The openings between yarns are in the range of 0.06 inch to 1.0 inch across. Fiber type and weave density are chosen to achieve the desired combination of elongation, stiffness, tensile strength, and cost. The weave orientation may be straight, 45° bias, or another variation.

Multiple layers of textile may be used for some applications. An additional layer of polyurethane is applied before each layer of textile, preferably keeping the total coating thickness less than 0.5 inch.

Because the loosely-woven textile is very flexible and the elastomer is typically sprayed on, this composite coating can be used on complex shapes. The coating is thin and light-weight, making it practical even for airplane bulkheads and similar applications.

Many polymers, including polyurethane and epoxy, decompose into toxic gases when burned, so a fire-resistant paint is preferably applied as the top surface of the composite coating. In some applications, it is preferable to use an elastomer/textile combination that is inherently fire resistant, such as silicone/fiberglass.

The composite, formed-in-place coating of the present invention may be installed more quickly than wrapping with

US 6,806,212 B2

3

pre-impregnated panels. Quick installation lowers labor cost and is an advantage when reinforcing structures that are inhabited or in use.

The finished coating is relatively light-weight and thin, making it especially applicable to airplane bulkheads and piping. The coating of the present invention can be used where there is not enough clearance for sandbags, shields, sprayed-on concrete, or similar brute force protection.

The invention will now be described in more particular detail: Many modifications and variations of the present invention are possible; it is to be understood that within the scope of the appended claims the invention may be practiced otherwise than as specifically described.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an environmental view of the composite coating being applied to a wall.

FIG. 2 is a cross-sectional view of the composite coating applied to an interior corner in a structure.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is a composite coating 10 and method of application of coating 10 for reinforcing structures 100 such as buildings, bridges, storage tanks, piping, walls 101, floors 103, columns, and airplane bulkheads to increase their resistance to unusual forces. The potential forces may be those anticipated from explosion of hazardous materials such as petroleum products, steam, munitions, or reactive chemicals, may result from sabotage or terrorist attack, or may be due to an earthquake. FIG. 1 is an environmental view of coating 10 being applied to a wall 101.

Coating 10 includes two layers of rubbery polymer, or elastomer, such as polyurethane 27, with a layer of loosely woven or knit textile 40 embedded between the layers of polyurethane 27. The combination of polyurethane 27 and strong but very flexible textile 40 gives composite coating 10 high elongation and tensile strength. Composite coating 10, applied to a structure, increases the apparent ductility and elongation of the structure.

The elastomer is applied in the form of a fluid precursor that crosslinks (cures) under ambient conditions to form a solid rubbery layer that adheres strongly to most building materials, including concrete, wood, and metal. Epoxy, silicone, urethane, polyurea, neoprene, butyl rubber, and natural rubber (latex) are examples of materials that can be formulated to be rubbery when cured and that adhere to many other materials. Other elastomers can be used for this invention, also. If the structure to be strengthened is of an unusual material not spontaneously wetted by common elastomers, an adhesion-promoting primer may be preapplied.

The selected elastomer is preferably one that cures without addition of heat and without evolving solvent vapors, so that it can be applied in the field, such as outdoors or in an inhabited room. Generally, elastomers that cure within these limitations are two-component systems, that is, crosslinking results from reaction between two different chemical components. Both components may end up as part of the elastomer, or one component may act as a catalyst to enable the other component to react within itself to form crosslinks, which solidify the fluid into a solid.

RTV silicone cures upon absorption of water vapor from the air, but this reaction is generally slower than is preferable

4

for the present invention. A thermoplastic elastomer may be applied warm and allowed to "cure" simply by cooling. An emulsion or solution of an elastomer that "cures" by evaporation of the solvent may be used, but the advantage of being able to install the reinforcing coating rapidly in an inhabited area would be largely lost.

One preferred elastomer is polyurethane 27, preferably sprayed on as a two-part mix. Mixing gun 90 mixes the two components 22, 23, often called Part A and Part B, in the correct stoichiometric ratio so that Part A 22 and Part B 23 mix in flight and begin to cure into a rubbery solid immediately.

The mixed precursor 24 is fluid for a short time, then becomes a gel as crosslinks start to form. A gel does not run or slump, but is plastically deformed by small forces. After all available crosslinks have formed, polyurethane 27 is cured and considered a solid, although it is rubbery.

In another preferred embodiment, not depicted, Part A 22 and Part B 23 are premixed in a container and the mixture is applied to the surface of the structure by brush or roller. In this embodiment, a formulation is used that gels somewhat slower than a formulation used for spray application.

A preferred sprayable formulation of polyurethane 27 has been found to have typical elongation of 600–700%, Shore D hardness between 35 and 50, and tensile strength of over 4000 psi. This formulation gels in around 5 seconds, is nontacky after about 20 seconds, and achieves full cure after 24 hours. The mixing ratio of Part A 22 and Part B 23 is one to one and no volatile organic solvents are released.

In FIG. 1, first layer 20 is already applied to a structure 100, such as wall 101 of a building, and has crosslinked so as to be gelled polyurethane 26. Textile 40, such as woven cloth 41, is shown already affixed over gelled polyurethane 26 of first layer 20. Woven cloth 41 includes yarns 44 and openings 45.

Mixing gun 90 uses gas, such as compressed air from tank 91, to draw Part A 22 and Part B 23 of a two-part system from their respective containers and mix them in the stoichiometric blend that will result in proper curing. Mixed fluid precursor 24 is sprayed from mixing gun 90 onto wall 101.

Fluid precursor 24 is applied so as to yield a cured polyurethane 27 of 0.03 to 0.25 inch thick, with a preferred total thickness of about 0.5 inch. First and second layers 20, 30 are preferably thick enough to fully embed cloth 41. It is essential that first layer 20 not be thicker than 0.25 inch thick, so that the properties of first layer 20 and cloth 41 combine. In other words, in the event of an explosion, wall 101 should interact with coating 10 as a composite, not with elastomer first and cloth 41 soon afterward.

Polymers typically shrink as they cure, so applied fluid precursor 24 should be slightly thicker than the desired cured polyurethane 27. For a formulation of a given viscosity, coating thickness is mainly controlled by the speed of travel of mixing gun 90, so training and practice are required to operate gun 90.

One skilled in the art will realize that surface 102 oof wall 101 must be fairly clean and sound before application of first layer 20. Grease, water, or other deposits on surface 102 will decrease the adhesion of coating 10 to structure 100. Thick dust or a crumbly or peeling texture of surface 102 will decrease the overall cohesive strength of reinforced structure 100.

It is generally not necessary to apply a porosity-reducing primer before application of first layer 20, nor is vacuum treatment of applied first layer 20 required.

US 6,806,212 B2

5

After a first layer 20 of fluid precursor 24 is applied to structure 100, a piece of textile 40 is pressed against gelled coating 26. Gelled coating 26 is tacky enough that simply placing textile 40 against it causes textile 40 to adhere.

Textile 40, such as woven cloth 41 or a knit fabric, is woven or knit from yarns 44 of a fibrous material such as fiberglass, carbon, or polyaramid. Other types of fiber, including nylon; polyester; natural fibers such as cotton, wool, linen, or silk; or synthetic forms of natural fibers, such as synthetic spider silk; may also be used. More than one type of fiber may be combined within yarns 44 or cloth 41. To improve the adhesion of cloth 41 to elastomer 27, it is preferred that cloth 41 be treated with a coupling agent, such as a nearly monomolecular layer of a polysiloxane.

The openings 45 between yarns 44 are in the range of 0.06 inch to 1.0 inch across. Fiber type and weave density are chosen to achieve the desired combination of elongation, stiffness, tensile strength, and cost. The orientation of yarns 44 also affects the properties of woven cloth 41. Yarns 44 may intersect each other at angles of 90°, 45°, or other angles. For example, cloth 41 may be woven with vertical yarns 44 of nylon fiber, horizontal yarns 44 of glass fiber, with yarns 44 of cotton passing diagonally through cloth 41. It is advantageous for some applications to design cloth 41 so that certain of yarns 44 break predictably sooner than other yarns 44.

The piece of cloth 41 may be precut before application of fluid precursor 24, so that cloth 41 may be affixed without delay. Thus, anchors or fasteners are not needed on flat surfaces.

Although this invention is described and illustrated as a single piece of cloth 41 embedded between first and second layers 20, 30, additional layers of elastomer and cloth may be installed using the same technique as described above.

FIG. 2 is a cross-sectional view of coating 10 installed in an interior corner of a building where wall 101 meets floor 103. First layer 20 was applied to surface 102 of wall 101 and to surface 104 of floor 103. In this case, "interior" does not mean the corner must be inside a building, but rather that floor 103 meets wall 101 at a dihedral angle of less than 180°.

Edge portion 42 of a piece of cloth 41 is defined here as the outermost eight inches from the periphery of cloth 41; the central portion 43 being the remainder of cloth 41, within edge portion 42. For maximum strength of the reinforced building, layout of cloth 41 should be planned so that interior corners, such as where wall 101 and floor 103 meet, are covered by central portion 43. Cloth 41 preferably curves concavely over the corner. Opposite edge portions 42 are affixed to opposite members of the corner.

In the case of exterior corners, that is, corners where two walls, a wall and ceiling, a wall and a floor, or other members meet with a dihedral angle of greater than 180°, the corner is preferably covered by central portion 43 but a radius is not preferred. A joint without an angle, such as a seam where two precast portions of wall are butted together, is also preferably covered by central portion 43.

In the case of the interior corner of wall 101 and floor 103 depicted in FIG. 2, the radius of the curve described by cloth 41 is preferably 0.4 inch or greater and is typically about 2 inches. For an interior corner in a small structure 100, such as a blast resistant seat for a person, cloth 41 would curve with a typical radius of 0.125 to 0.4 inch.

It is preferred that the edge portions 42 of pieces of cloth 41 affixed adjacent each other should overlap by about 6 to 12 inches instead of being butted against each other.

6

It is preferred, but not essential, that anchors, such as disclosed in U.S. Pat. No. 5,649,398, be used to strengthen the attachment of edge portions 42 on opposite sides of the corner in applications where especially high strength is desired.

To aid the persons installing coating 10 achieve the correct radius in an interior corner, coving 50 is pre-cast, preferably from the same polyurethane 27 as is being used for coating 10. Coving 50 is installed in the corner and may be glued into place with any appropriate adhesive 51 known to the trade, to fill in the vertex segment of the dihedral angle, and define a radius. First layer 20 is sprayed over coving 50. Coving 50 also prevents a void from forming between cloth 41 and first layer 20.

Casting coving 50 from the same polyurethane 27 as first layer 20 is preferred for good adhesion between coving 50 and first layer 20. Materials with different thermal expansion properties tend to separate from each other when exposed to thermal cycles, including diurnal or seasonal variation.

Also, it is generally preferred that first layer 20 and second layer 30 be of the same polyurethane 27. That way, first layer 20 and second layer 30 will share the same hardness, chemical nature, and thermal expansion characteristics. Different elastomers can be used for first layer 20 and second layer 30 if the two elastomers are sufficiently compatible.

Most of the above-cited examples of preferred elastomers and textiles are flammable and some evolve toxic fumes when burned. A composite of silicone elastomer and glass fiber is inherently fire-resistant, and polyimide fiber can withstand fairly high temperatures without decomposing. For most composites, though, including the most-preferred polyurethane/glass combination, a means for increasing the fire-resistance of coating 10 is included in second layer 30. Fire-resistant paint 32 can be applied over second layer 30, or second layer 30 may include an admixture of intumescent powder, or both. Similarly, second layer 30 may include reflective or filtering components to increase the resistance of the composite to ultraviolet light or an ultraviolet resistant paint can be applied over second layer 30.

The invention has been shown and described with reference to certain specific embodiments, however, it is to be understood that modifications and substitutions can be made by a person skilled in the art without departing from the spirit and scope thereof.

I claim:

1. In combination: a structure that includes a wall having a surface; and a composite coating adhering to said surface of said wall for increasing the resistance to explosion forces of said structure; comprising:

a first layer comprising an elastomer in intimate contact with and adhering permanently to said surface of said wall;

a second layer comprising an elastomer in intimate contact with and adhering permanently to said first layer; and

textile embedded between said first and second layers, wherein said elastomer is the product of a fluid precursor that cures in ambient conditions to form said elastomer, and wherein said composite coating functions to increase the apparent ductility and elongation of the wall when sudden lateral or explosive force is applied to the structure, wherein said fluid precursor is a two-component formulation the reacts upon mixing to become an elastomer.

2. The combination of claim 1, wherein said fluid precursor is a two-component formulation that reacts upon mixing to become polyurethane elastomer.

US 6,806,212 B2

7

3. The combination of claim 2, wherein said two-component formulation is applied to said surface by spraying.

4. The combination of claim 1, said textile comprising a fabric including yarns of glass, carbon, polyaramid, or polyimide.

5. The combination of claim 4, wherein said yarns are woven with adjacent parallel yarns spaced apart one-sixteenth of an inch to one inch so as to create openings in said textile penetrable by said fluid precursor.

6. The combination of claim 1, said second layer further including means for rendering said coating fire-resistant.

8

7. The combination of claim 1 wherein: said composite coating covers substantially the entire said surface of said wall.

8. The combination of claim 1 wherein: said composite coating covers a portion of each of two said walls and an interior angle connecting said two walls, and further including:

a coving installed in the vertex of the interior angle, for supporting said composite coating in forming a curve having a radius of 0.4 inch or greater.

* * * * *

# EXHIBIT "B"

# AGREEMENT FOR PURCHASE
# AND
# SALE OF PATENT

This Agreement for Purchase and Sale of Patent (the "Agreement") is made and entered into as of September 10, 2005, by and among Defenstech International, Inc., a Nevada corporation (the "Company"), and Fyfe Co., LLC, a California limited liability company ("Seller").

## RECITALS

WHEREAS, Seller is the sole and exclusive owner of all right, title and interest in and to United States Patent No. US 6,806,212 B2 dated October 19, 2004 titled Coating and Method For Strengthening A Structure (the "Patent");

WHEREAS, Seller has commissioned and paid for a test report with respect to the Patent issued by Wilford, Baker Engineering, Inc. and may have certain rights with respect to the report which, to the extent such rights are transferable, are hereafter called the "Rights."

WHEREAS, the Company desires to acquire the Patent and the Rights from the Seller and the Seller desires to sell the Patent and the Rights to the Company upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the covenants, promises, representations and warranties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Sale of Patent and Rights.</u>

      1.1      <u>Sale of Patent.</u>  Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 3) the Seller shall sell, assign and transfer to the Company and the Company shall purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the Patent, including any divisions, continuations, reissues and extensions of the Patent, together with all rights of action and recovery for past infringement of the Patent.

      1.2      <u>Sale of Rights.</u>  Subject to the terms and conditions of this Agreement, at the Closing the Seller shall sell, assign and transfer to the Company and the Company shall purchase and acquire from the Seller, all of the Seller's right, title and interest, if any, in and to the Rights.

      2.      <u>Consideration.</u>  As consideration for the sale, assignment and transfer of the Patent and Rights to the Company, at the Closing the Company shall (a) pay to the Seller the sum of Seventy-Five Thousand U.S. Dollars ($75,000) and (b) issue and sell to the Seller Two Million (2,000,000) shares of common stock of the Company.

3.    Closing.

3.1    Time and Place.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement at 25232 Rockridge Road, Laguna Hills, California 92653.

3.2    Deliveries by the Seller.  At the Closing, the Seller shall deliver to the Company an Assignment of the Patent in the form of the Assignment attached as Exhibit A hereto. The Rights, if any, shall be automatically transferred at the Closing.

3.3    Deliveries by the Company.  At the Closing, the Company shall deliver to the Seller the following:

(a)    a bank cashier's check payable to the Seller in the amount of $75,000; and

(b)    a stock certificate issued in the name of the Seller for 2,000,000 shares of the Company's common stock (the "Shares").

4.    Representations and Warranties of the Seller and Fyfe Regarding the Patent and Technical Know-How and Other Intellectual Property.  The Seller and Fyfe, jointly and severally, represent and warrant to the Company as follows:

4.1    Fyfe has duly and validly sold, transferred and assigned to Seller all of Fyfe's right, title and interest in and to the Patent pursuant to a valid and enforceable assignment which the Company has recorded or will promptly record with the U.S. Patent and Trademark Office.

4.2    Seller has the right to duly and validly sell, transfer and assign to Company all of its right, title and interest in and to the Patent.

4.3    Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and duly qualified and admitted to do business in the State of California.

4.4    Edward R. Fyfe is the Manager and controls the members of Seller.  By his signature to this Agreement he represents and warrants to the Company that he has full authority to act on behalf of the Seller in the execution, delivery and performance of this Agreement and in all matters concerning this Agreement.

4.5    Seller has full power and authority to execute and deliver this Agreement and the Assignment attached as Exhibit A  hereto, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Seller's Manager has duly and validly authorized and approved this Agreement.  This Agreement and the Assignment attached as Exhibit A hereto have been duly and validly executed and delivered by Seller and each constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms.

4.6     The execution and delivery by Seller of this Agreement and the Assignment attached as Exhibit A hereto does not, and the performance by Seller of its obligations under this Agreement and the Assignment attached as Exhibit A hereto and the consummation of the transactions contemplated hereby and thereby do not and will not:

(a)     conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Articles of Association or Operating Agreement of Seller;

(b)     conflict with or result in a violation or breach of any law applicable to Seller or any of its assets or properties; or

(c)(i)    conflict with or result in a violation or breach of, (ii) constitute a default (or an event that, with or without notice or lapse of time or both, would constitute a default) under, (iii) require Seller to obtain any consent, approval or action of, make any filings with or give any notice to any person as a result or under the terms of, or (iv) result in the creation or imposition of any lien upon Seller or any of its assets or properties under any of the terms, conditions or provisions of any contract, agreement or instrument to which Seller is a party or by which any of its assets and properties are bound.

4.7     Seller is the sole and exclusive owner of all right, title and interest in and to the Patent, and the Patent is not subject to any liens, claims, security interests, charges, encumbrances or restrictions of any kind or nature whatsoever, except that a blanket UCC filing in favor of Union Bank of California as Secured Party may cover the Patent and if so Seller shall cause such filing to be released as to the Patent promptly after the Closing.

4.8     Seller has not sold, transferred or assigned or agreed to sell, transfer or assign any interest in or to the Patent or the Technical Know-How to any other person, entity or third party.

4.9     Seller has not granted any license or right to use or agreed to grant any license or right to use the Patent or the Rights to any other person, entity or third party.

4.10    Seller has not received notice of any pending or threatened claim, legal action or proceeding claiming that the possession and use of the Patent by Seller or by the Company would violate the patents, trade secrets or other intellectual property rights of any person, entity or third party.

4.11    Seller agrees to execute and deliver to the Company such further instruments and documents and perform such further acts and things as may be reasonably required to carry out the purposes and intent of this Agreement, including the execution and delivery of instruments and documents for recordation of the Assignment attached as Exhibit A hereto in the U.S. Patent and Trademark Office.

4.12    Except as represented or warranted in this Agreement, Seller has made, makes and will make no representations, warranties or other assurances or statements in any way concerning the Patent or the Rights, including no representations as to the uses to which the Patent or Rights may be put, that the possession or use of the Patent or the rights would not infringe or violate the patents, trade secrets, or other intellectual property rights of any person

3

entity or third party, or that an assignment of the Rights confers any rights to exclusive use of the engineer's report or to exclude others from using the report or any information in it.

     5.    <u>Investment Representations of the Seller</u>.  The Seller hereby represents and warrants to and agrees with the Company that:

     (a)    Seller understands that (i) the Shares have not been registered or qualified under the Securities Act of 1933, as amended (the "Act"), or state securities or "Blue Sky" laws, on the ground that the sale and issuance of the Shares pursuant to this Agreement is exempt from registration and qualification under Federal and applicable state securities laws, rules and regulations pertaining to transactions not involving a public offering, and (ii) the Company's reliance on such exemptions is predicated on the Seller's representations and warranties herein.

     (b)    Seller acknowledges that neither the Securities and Exchange Commission ("SEC") nor any state securities commission has approved the Shares or passed upon or endorsed the merits of the offer and sale of the Shares to Seller.

     (c)    Seller, personally or together with Seller's advisors, has such knowledge and experience in financial and business matters that Seller, personally or together with Seller's advisors, is capable of evaluating the merits and risks of an investment in the Shares and, by reason of Seller's financial and business experience, personally or together with the Seller's advisors, Seller has the capacity to protect Seller's interest in connection with such investment.

     (d)    Seller acknowledges that the Company has made available to Seller and Seller's advisors the opportunity to obtain all information Seller and/or Seller's advisors consider necessary or appropriate in deciding whether to invest in the Shares, and Seller and/or Seller's advisors have received all information requested from the Company.  Seller and/or Seller's advisors have had an opportunity to ask questions and receive answers from the Company's management regarding the business, financial affairs and other aspects of the Company and have further had the opportunity to obtain any information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which Seller and/or Seller's advisors deem necessary to evaluate an investment in the Shares and to verify the accuracy of information otherwise provided to Seller and/or Seller's advisors.

     (e)    Seller understands that investment in the Shares is speculative and involves a high degree of risk, and acknowledges that (i) the Company is newly organized and has no operating history on which to base an evaluation of its business and prospects; (ii) the Company's development and operations are subject to all of the risks inherent in the growth of an early stage company; (iii) the likelihood of the success of the Company must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the growth of a new business, including limited financial resources, uncertain market acceptance of the Company's products, intense competition, government regulation and general economic conditions; (iv) the Company has not generated any revenues to date, and there can be no assurance that the Company will be able to penetrate its target market and generate any significant revenues or that the Company will be able to achieve or maintain profitable operations; (v) that the Company requires a significant amount of additional capital to implement its business strategy, and there can be no assurance that any such additional capital will be available when needed or on terms acceptable to the Company, or that such additional capital, if available, would not result in substantial dilution of the equity interests of its shareholders; and

(vi) that the Company intends to amend its Articles of Incorporation to authorize a class of Preferred Stock and to increase the authorized number of shares of its common stock; that the Articles of Incorporation do not (and after amendment will not) provide preemptive rights to the Company's shareholders; and that any future issuances of the Company's capital stock will reduce the Seller's percentage ownership of the Company's outstanding capital stock.

(f)   Seller is unaware of, and is in no way relying on, any form of general solicitation or general advertising in connection with the offer and sale of the Shares.

(g)   This Agreement is made with Seller in partial reliance upon such Seller's representations to the Company, which by Seller's execution of this Agreement, the Seller hereby confirms, that the Shares issuable to Seller will be acquired for investment for Seller's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Seller has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Seller further represents that Seller does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares to be purchased by Seller.

(h).   Seller understands that the Shares Seller is purchasing are characterized as "restricted securities" under Federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations, such Shares may be resold without registration under the Act only in certain limited circumstances. Seller has been advised or is aware of the provisions of Rule 144 promulgated under the Act as in effect from time to time, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144 and the number of shares being sold during any three-month period not exceeding specified limitations. If the Company files a registration with the Securities Exchange Commission to register any capital stock of the Company or security convertible into capital stock, the Company will include the Shares in such registration statement and secure the registration of the Shares at the same time as any other shares of capital stock or convertible securities are registered.

(i)   The certificates representing the Shares will bear a legend to the effect set forth below, and appropriate stop transfer instructions against the Shares will be placed with any transfer agent of the Company to ensure compliance with the restrictions set forth herein.

"The shares represented hereby have not been registered under the Securities Act of 1933, as amended, or any state securities law and may not be sold, offered for sale, transferred, assigned, pledged, or hypothecated unless and until registered under such Act and any applicable state securities laws, or unless the corporation has received an opinion of counsel to the holder of the shares or other evidence, satisfactory to the corporation and its counsel, that such registration is not required."

5

(j)     Seller understands that no public market now exists for any of the securities issued by the Company, and that the Company has given no assurances that a public market will ever exist for any of the Company's securities.

(k)     Seller is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Act.

(l)     Seller was not formed for the specific purpose of acquiring the Shares; such entity is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; the consummation of the transactions contemplated hereby is authorized by, and will not result in a violation of its charter or other organizational documents; such entity has full power and authority to execute and deliver this Agreement and all other related agreements or certificates and to carry out the provisions hereof and thereof and to purchase and hold the Shares; the execution and delivery of this Agreement has been duly authorized by all necessary action; and this Agreement has been duly executed and delivered on behalf of such entity and is a legal, valid and binding obligation of such entity.

(m)     Seller represents to the Company that the information contained herein is accurate and may be relied upon by the Company in determining the availability of an exemption from registration under Federal and state securities laws in connection with the issuance and sale of the Shares.

6.     Representations and Warranties of Company.   The Company hereby represents and warrants to the Seller as follows:

(a)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada with corporate power to own its own properties and carry on its business as now being conducted.  The Company is duly qualified to do business as a foreign corporation and in good standing in each jurisdiction in which the character of its properties or the nature of its business makes such qualification necessary, except where the failure to so qualify would not have a material adverse effect on the Company or its business.

(b)     The Company has full corporate power and authority to enter into this Agreement.  This Agreement has been duly authorized, executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company.

(c)     The authorized capital stock of the Company consists of 10,000,000 shares of Common Stock, of which 6,900,000 shares are issued and outstanding.  Except for 100,000 shares of Common Stock reserved for future issuance to employees or consultants, there are no other outstanding shares of capital stock or outstanding options, warrants or other agreements for the purchase or acquisition from the Company of any shares of its capital stock.

(d)     The Shares, when sold and delivered to the Seller in accordance with the terms herewith, will be validly issued, fully paid and nonassessable.

(e)     There are no actions, suits, claims or proceedings pending or threatened against or affecting the Company or any of its properties in any court or before any arbitrator of any kind or before or by any governmental body.

6

(f)     No consent, approval or authorization of, or registration, filing or declaration with, any governmental body, or the vote, consent or approval in any manner of the holders of any security of the Company, is required for the issuance and sale of the Shares or for the performance by the Company of this Agreement except, if required, filings to be made under federal and applicable state securities laws upon or after the sale of the Shares.

(g)     The financial statements of the Company delivered to Seller shortly before execution of this Agreement correctly and completely reflect as of their date the financial condition of the Company in all material respects and the classes and amount of capital stock authorized and outstanding.   Such financial statements were prepared in accordance with generally accepted accounting principles. There are no material claims or liabilities not reflected in such financial statements. There have been no events or other changes since the date of such financial statements that have materially and adversely affected the financial condition of the Company as shown on such financial statements.

8.     Technical Assistance.   At the Company's request, the Seller shall provide the Company with a reasonable amount of technical assistance as shall be reasonably required by the Company to develop and manufacture products covered by the Patent in accordance with specifications as are agreed to in writing by the Company and the Seller with respect to each product. The terms and payment for such assistance shall be agreed upon in writing prior to the Seller commencing to render such services. On reasonable notice and subject to availability, (a) the Seller shall make Edward R. Fyfe available for consultation without charge on an incidental basis at times and places that do not interfere with his duties to the Seller, (b) make Mr. Fyfe available in connection with any pending or threatened litigation or proceeding concerning the Patent or the Rights at an hourly charge of $300 plus out of pocket travel and other expenses, and (c) the Seller shall arrange for the consultation or training services of Fibrwrap Construction, Inc. at charges set out in its then current price list.

9.     License to Seller.     The Company hereby grants the Seller a perpetual worldwide license to use the Patent and the Rights in the ordinary course of its business which may include manufacturing or using products in competition with the Seller.   The Seller may assign or sublicense the license hereby granted to any of its Affiliates.   The term "Affiliates" means persons or entities controlled by or under common control with the Seller.   Neither the Seller nor any of its Affiliates may assign or sublicense the license hereby granted to any other person or entity except to the extent necessary or appropriate for the applicator or installer of the Seller's or an Affiliate's products to perform a specific job relating to the Patent.   However, the license may be transferred in connection with the sale or other transfer of substantially all the assets or equity interest in the entity holding the license.

10.  Right of First Refusal.

(a)     If the Company desires to sell, transfer, assign or convey the Patent, or the Company engages in any transaction by way of merger, sale of equity interests or other transaction that results in a change in the control of the Company, each of the foregoing transactions hereafter being called a "Transfer," the Company shall deliver to the Seller notice of its desire to complete such Transfer together with an executed copy of a bona fide

7

written contract (the "Purchase Contract") with a proposed purchaser. The Seller shall have the right to enter into the transaction set out in the Purchase Contract (the "Transaction") on the terms set out in the Purchase Contract by notifying the Company within sixty (60) days following receipt of the Company's notice (the "Response Period"). If the Seller does not give notice to the Company of the exercise of its election to enter into the Transaction within the Response Period, such failure to notify shall be deemed to constitute the Seller's election not to enter into the Transaction.

(b)     If the Seller notifies the Company of its desire to enter into the Transaction within the Response Period, the Company and the Seller shall be bound to complete the Transaction on the terms set out in the Purchase Agreement, and the Closing shall take place on the later of (a) the date for closing set forth in the Purchase Contract or (b) thirty (30) days after Seller has notified the Company of the exercise of its right to enter into the Transaction.

(c)     If the Seller does not exercise its right of first refusal, the Company may proceed to complete the Transfer, but no such Transfer shall be made at a price less than the price in the Purchase Contract or otherwise on provisions less favorable to the Company than in the Purchase Contract without first sending to the Seller a new notice setting forth such new price an/or provisions. If the Transfer to any such proposed purchaser is not consummated within sixty (60) days after expiration of the Response Period or at the time specified in the Purchase Contract, whichever is later, any Transfer thereafter, whether to the same or any other purchaser, shall be subject to the Seller's right of first refusal and all of the other provisions of this Article 10. No failure of the Seller to exercise its right to purchase in any one or more instances shall constitute a waiver of the Seller's right to purchase at the time of any subsequent proposed Transaction, and the Seller shall continue to enjoy such right of first refusal with respect to any and all subsequent proposed sales.

11.     Miscellaneous.

(a)     This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Company and the Seller and their respective successors and permitted assigns.

(b)     Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party if given by personal delivery, overnight mail, facsimile, or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice, demand or other communication is given by personal delivery or facsimile service shall be conclusively deemed made at the time of receipt. If such notice, demand or communication is given by overnight mail, such notice shall be conclusively deemed given twenty-four (24) hours after delivery of such notice addressed to the Company or to the Seller at their respective addresses set forth on the signature page below (or at such other address as the party shall have furnished in writing in accordance with the provisions hereof), to the overnight mail carrier. If

8

such notice, demand or other communication is given by mail, such notice shall be conclusively deemed given forty-eight (48) hours after the deposit thereof in the United States mail addressed to the Company or to the Seller at their respective addresses set forth on the signature page below (or to such other address as the party shall have furnished in writing in accordance with the provisions hereof).

(c)     This Agreement may be amended only by a writing executed by all parties.

(d)     This Agreement is not transferable or assignable by the Seller. However, the Seller or its transferees may transfer the Shares to any person or entity subject to the restrictions set out in this Agreement. The Seller hereby directs that the Shares be issued in the name of Fyfe Enterprises, Inc.

(e)     All pronouns contained herein and any variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the identity of the parties hereto may require.

(f)     This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(g)     Delivery of an executed counterpart of this Agreement or any exhibit attached hereto by telefacsimile transmission shall be equally as effective as delivery of an executed hard copy of the same. Any party delivering an executed counterpart of this Agreement or any exhibit attached hereto by telefacsimile transmission shall also deliver an executed hard copy of the same, but the failure by such party to deliver an executed hard copy shall not affect the validity, enforceability and binding effect of this Agreement or such exhibit.

(h)     This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to conflicts of laws principles.

(i)     This Agreement constitutes the final, complete and exclusive statement or all agreements or obligations between the parties. This Agreement embodies the entire agreement and understanding between the parties hereto and supercedes all prior agreements and understandings relating to the subject matter hereof.

(j)     If any legal action, arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs reasonably incurred in connection with such action or proceeding, in addition to any other relief to which such party may be entitled.

9

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement effective as of the date first hereinabove written.

COMPANY                                        SELLER

DEFENSTECH INTERNATIONAL, INC.                 FYFE CO., LLC

By: _____                     By: _____
Its: ____CEO____                               Its: ____President____

Address: _25232 Rockridge Road___              Address: 6310 Nancy Ridge Dr., #103
Laguna Hills, California 92653                 San Diego, California 92121


                                               FYFE

                                               _____
                                               Edward R. Fyfe

                                               Address:6310 Nancy Ridge Dr., #103
                                               San Diego, California 92121


G:\Home\1028-DT\020\purchase agmt v.2.doc

10

# UNITED STATES OF AMERICA
## ASSIGNMENT

WHEREAS,

### FYFE CO., LLC

Nancy Ridge Technology Center

6310 Nancy Ridge Drive, Suite 103

San Diego, California  92121

(hereinafter referred to as ASSIGNOR) is the owner of the United States patent and the inventions covered thereby, and identified as US 6,806,212 B2 and

WHEREAS,

### DEFENSTECH INTERNATIONAL INC.

25232 Rockridge Road

Laguna Hills, California  92653

(hereinafter referred to as ASSIGNEE), is desirous of acquiring the entire interest in said patent and invention;

NOW, THEREFORE, in consideration of the sum of one dollar ($1.00) paid to ASSIGNOR, and other good and valuable consideration (as described in a separate agreement), receipt of all of which is hereby acknowledged, said ASSIGNOR herby sells, assigns and transfers unto said ASSIGNEE, its successors and assigns, the entire right, title and interest in and to the United States patents and applications, and the inventions covered thereby, and any continuation, division, reissue or re-examination thereof, together with any and all claims and demands it may have at law or in equity arising out of infringements thereof.

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this assignment and sale.

IN WITNESS WHEREOF, said ASSIGNOR has caused this document to be duly executed this day, 10 September 2005.

_Edward R. Fyfe_
Edward R. Fyfe

_President_
Title

## EXHIBIT A



OFFICIAL CHECK

citibank
Citibank (West), FSB

FC# 00694 FA# 001
024-02 Ck. Ser.# 254933842

PAY ****SEVENTY-FIVE THOUSAND DOLLARS******

$0.00 ORL
254933842    *****75,000.00***

254933842

DATE 09/12/05

TO
THE
ORDER
OF        ****FYFE CO. LLC****

NAME OF REMITTER    DEFENSTECH INTERNATIONAL, INC.
ADDRESS             PATENT PURCHASE

DRAWER: Citibank (West), FSB

BY _____
AUTHORIZED SIGNATURE

⑆1202958 7⑈680005001⑆ 254933842

Acknowledged and Received by Mr. Edward R. Fyfe of Fyfe Co., LLC,
as per Agreement for Purchase and Sale of Patent dated September 10, 2005



SAN DIEGO
COMMERCIAL BANKING OFFICE

September 13, 2005

Mr. Edward Fyfe
Fyfe Co., LLC
6310 Nancy Ridge Drive, #103
San Diego, CA 92121

Re: Sale of Patent

Dear Ed:

This letter is to inform you that your recent sale of the patent # US 6-806-212B2 does not violate any conditions or covenants of your loan and that Union Bank does not have a secured interest in the patent.

Please let me know if I can be of any further assistance.

Sincerely,

Ken Sluder
Vice President



INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

# DEFENSTECH INTERNATIONAL, INC.

SEE RESTRICTIVE LEGEND ON REVERSE SIDE

AUTHORIZED CAPITAL STOCK 400,000,000 COMMON SHARES WITH A PAR VALUE OF $0.001 PER SHARE

SHARES
2,000,000

***10***

This Certifies that    Fyfe Co., LLC    Enterprises, Inc    is the

owner of    TWO MILLION    10,000,000 .000

fully paid and non-assessable Shares of the Capital Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this    10th    day    of September    A.D.    2005

Mike Jewell
SECRETARY

Mike Jewell
PRESIDENT

# EXHIBIT "C"

### UNANIMOUS WRITTEN CONSENT
### OF THE
### BOARD OF DIRECTORS OF
### DEFENSTECH INTERNATIONAL, INC.

The undersigned, constituting all of the Directors of DefensTech International, Inc., a Nevada corporation (the "Corporation"), do hereby adopt, pursuant to the provisions of the Nevada General Corporation Law and the Corporation's By-Laws, the following resolutions with the same force and effect as if same had been adopted at a meeting of the Board of Directors duly called therefor:

WHEREAS, on June 1, 2007, the Board, by unanimous written consent, approved the issuance to Alan R. Sporn ("Sporn"), an officer and director of the Corporation, of a promissory note in the approximate sum of $552,000, which sum was owed by the Corporation to Sporn and the Board authorized the filing of a lien as against the Corporation; and

WHEREAS, the Corporation issued its 6% promissory note to Sporn in the principal amount of $600,000 and executed a Security Agreement dated June 15, 2007 in favor of Sporn; and

WHEREAS, Sporn filed a Form UCC-1 with the Secretary of State of the State of California evidencing the lien against the Corporation; and

WHEREAS, Sporn and the Corporation have agreed to amend the Form UCC-1 to set forth additional collateral as reflected in the Form UCC-1, as amended;

NOW, THEREFORE, IT IS

RESOLVED, that the Corporation hereby consents to Sporn filing an amendment to Form UCC-1 as filed with the Secretary of State of the State of California on June 15, 2007 adding therein the following language at Item 8 of the amendment to the UCC Financing Statement: "The collateral is all property of the debtor, both real and personal, along with a security interest in all assets of the debtor, including, without restricting the generality of the foregoing, all intellectual property including registered patents, patents pending, registered trademarks and trade names"; and it was

FURTHER RESOLVED, that the officers of the Corporation be, and they hereby are, authorized, empowered and directed to take any and all steps, and to execute and deliver any and all instruments in connection with carrying the foregoing resolutions into effect.

DefensTech\Minutes\UWC-Amend UCC Filing 9-07

IN WITNESS WHEREOF, the undersigned Directors have executed this Unanimous Written Consent as of the 27th day of September, 2007.

Alan R. Sporn

William J. Murphy

Gerrard Connolly

Danny Joyce

Don Carnegie

Edward R. Fyfe

Richard A. Sporn

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Alan R. Sporn   949-643-8585

**B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)**

Alan R. Sporn
25232 Rockridge Road
Laguna Hills, CA 92653

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # 07-7117791666 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☒ Debtor  or  ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| DefensTech International, Inc. | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted  or  ☒ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

The collateral is all property of the debtor, both real and personal, along with a
security interest in all assets of the debtor, including, without restricting the
generality of the foregoing, all intellectual property including registered
patents, patents pending, registered trademarks and trade names.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☒ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| DefensTech International, Inc. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## MINUTES OF THE SPECIAL MEETING
## OF THE BOARD OF DIRECTORS OF
## DEFENSTECH INTERNATIONAL, INC.

A telephonic meeting of the Board of Directors of Defenstech International, Inc. (the "Company") was held on November 7, 2007, at 9:00 A.M. Pacific coast time. The following members of the Board of Directors were telephonically present at the meeting on a conference call at which each of the Directors present was able to communicate with each other: Alan R. Sporn, William Murphy, Richard Sporn, Don Carnegie and Gerrard Connolly. In addition and also present telephonically was Stanley R. Goldstein, Esq., of the law firm of Becker & Poliakoff, LLP.

Alan R. Sporn acted as Chairman of the meeting and indicated that pursuant to the Company's By-Laws, notice was sent by email to each of the Company's Directors on November 6, 2007, and each of the Directors responded to the email; acknowledged receipt thereof; and were either present at the meeting telephonically or indicated, in the case of Danny Joyce and Edward R. Fyfe, that they were not able to participate in the meeting.

The Chairman noted that a quorum of the Directors was present and that the meeting was duly convened for all purposes. The Chairman designated William Murphy as Secretary of the meeting.

The Chairman advised that the purpose of the special meeting of the Board of Directors was to cancel a $900,000 indebtedness of the Company to the Chairman in exchange for shares of the Company's Common Stock. The Chairman noted that presently the Company was indebted to the Chairman in the sum of $1,500,000; $600,000 of which was represented by a secured outstanding promissory note.

The Chairman further noted that the Company presently had issued and outstanding approximately 10,000,000 shares of Common Stock, $.001 par value, and Preferred Stock, $.001 par value, each share of which had one (1) vote. The Chairman then requested that the Company issue to the Chairman in full release of $900,000 indebtedness of the Company to the Chairman 5,000,000 shares of the Company's Common Stock at the rate of $.18 of indebtedness for each share of Common Stock.

The Chairman further stated that upon issuance of the 5,000,000 shares of the Company's Common Stock, the Chairman would own in excess of 50% of the Company's outstanding voting securities.

William Murphy, a Director of the Company, thereupon moved the meeting that the Company issue to Alan R. Sporn, an officer and director of the Company, 5,000,000 shares of the Company's Common Stock, $.001 par value, in consideration of the release by the Chairman of $900,000 of indebtedness of the Company to the Chairman.

Richard Sporn seconded the motion.

Thereupon and upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Company issue to Alan R. Sporn, 5,000,000 shares of the Company's Common Stock, $.001 par value, in consideration of the release by Alan R. Sporn of $900,000 of the Company's indebtedness to Alan R. Sporn.

There was no dissenting vote.

Thereupon and upon motion duly made, seconded and unanimously carried, it was resolved that the meeting be adjourned.

_____
William Murphy, Secretary

IN WITNESS WHEREOF, the undersigned Directors have executed the Minutes of the Special Meeting of the 7th day of November, 2007.

_____
Alan R. Sporn

_____
Gerrard Connolly

_____
Danny Joyce

_____
Don Carnegie

_____
Edward R. Fyfe

_____
Richard A. Sporn

DefensTech\Minutes\Board 11-07-07                2

# EXHIBIT "D"



## DefensTech™
### International Inc.
*Protecting Those Who*
*Protect and Serve*

5391 Oceanus Drive
Huntington Beach, CA 92649
Tel: 714.657.7977
Fax: 714.657.7978
Toll Free: 800.938.8838
Web: www.defenstech.com

For Guest Mr. Edward Fyfe
c/o: Bally's Hotel
Fax: 702-946-4405


Ed:

Please find enclosed simple agreement, per our conversation.

I sincerely appreciate this.

Please fax back to me at 714-657-7978.


Alan

*Dear Alan,*
*what I do for you.*
*Regards,*
*Edwd R. Fyfe*

**BALLISTIC PROTECTION** ● **BLAST MITIGATION** ● **INDUSTRIAL COATINGS**



**DefensTech**™
**International Inc.**
*Protecting Those Who*
*Protect and Serve*

5391 Oceanus Drive
Huntington Beach, CA 92649
Tel: 714.657.7977
Fax: 714.657.7978
Toll Free: 800.938.8838
Web: www.defenstech.com

January 23, 2008

Fyfe Co., LLC
6310 Nancy Ridge Drive
Suite 103
San Diego, CA 92121

Attention: Mr. Edward R. Fyfe
President

Re: <u>Patent Purchase Agreement of September 10, 2005 (the "Agreement")</u>

Dear Mr. Fyfe:

This is to confirm our agreement and understanding that for good and valuable consideration, the receipt whereof is hereby acknowledge, the parties thereto have agreed to amend (the "Amendment") the above referenced Agreement. Therefore the parties agree that section 10 of the Agreement which relates only to the right of first refusal is herewith deleted and is of no further force and effect.

I trust you agree with the foregoing. If so please sign and execute this Amendment to the Agreement which shall be effective on the date above written.

Very truly yours,

DefensTech International, Inc.

By: _____

CEO and President

Agreed and Consented to:
Fyfe Co., LLC

Edward R. Fyfe, President

**BALLISTIC PROTECTION ● BLAST MITIGATION ● INDUSTRIAL COATINGS**

# EXHIBIT "E"

  

**United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help

**Assignments on the Web > <u>Patent Query</u>**

# Patent Assignment Abstract of Title

## <u>NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.</u>

**Total Assignments: 7**

**Patent #:** <u>6806212</u>     **Issue Dt:** 10/19/2004     **Application #:** 10072677     **Filing Dt:** 02/07/2002

**Publication #:** <u>20030148681</u>     **Pub Dt:** 08/07/2003

**Inventor:** Edward R. Fyfe

**Title:** COATING AND METHOD FOR STRENGTHENING A STRUCTURE

## Assignment: 1

**Reel/Frame:** <u>012880/0266</u>     **Recorded:** 02/07/2002     **Pages:** 3

**Conveyance:** CORRECTION TO HAVING A COVER SHEET FORM INSTEAD OF A TRANSMITTAL FORM.

**Assignor:** <u>FYFE, EDWARD R.</u>     **Exec Dt:** 01/14/2002

**Assignee:** <u>FYFE CO, LLC</u>
6310 NANCY RIDGE DR, #103
SAN DIEGO, CALIFORNIA 92121

**Correspondent:** CALIF TERVO
6387 CAMINITO LAZARO
SAN DIEGO, CA 92111

## Assignment: 2

**Reel/Frame:** <u>017325/0331</u>     **Recorded:** 09/14/2005     **Pages:** 3

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** <u>FYFE CO., LLC.</u>     **Exec Dt:** 09/10/2005

**Assignee:** <u>DEFENSTECH INTERNATIONAL INC.</u>
25232 ROCKRIDGE ROAD
LAGUNA HILLS, CALIFORNIA 92653

**Correspondent:** DON CARNEGE
5405 ALTON PARKWAY
SUITE 5A #540
IRVINE, CA 92604

## Assignment: 3

**Reel/Frame:** <u>023691/0411</u>     **Recorded:** 12/23/2009     **Pages:** 6

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors:** <u>HEXCEL-FYFE CO., LLC</u>     **Exec Dt:** 11/20/2009
<u>FYFE, EDWARD ROBERT</u>     **Exec Dt:** 11/20/2009

**Assignee:** <u>FIBRWRAP CONSTRUCTION, L.P.</u>
8380 MIRALANI DRIVE
SUITE A
SAN DIEGO, CALIFORNIA 92126

**Correspondent:** SHEPPARD MULLIN RICHTER & HAMPTON
333 S. HOPE STREET
48TH FLOOR
LOS ANGELES, CA 90071

## Assignment: 4

| Reel/Frame: | 023691/0426 | Recorded: 12/23/2009 | Pages: 6 |
| Conveyance: | ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| Assignor: | FIBRWRAP CONSTRUCTION, INC. | Exec Dt: 11/20/2009 | |
| Assignee: | FYFE GROUP, LLC | | |
| | 8380 MIRALANI DRIVE | | |
| | SUITE A | | |
| | SAN DIEGO, CALIFORNIA 92126 | | |
| Correspondent: | SHEPPARD MULLIN RICHTER & HAMPTON | | |
| | 333 S. HOPE STREET | | |
| | 48TH FLOOR | | |
| | LOS ANGELES, CA 90071 | | |

## Assignment: 5

| Reel/Frame: | 026802/0982 | Recorded: 08/24/2011 | Pages: 10 |
| Conveyance: | ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| Assignor: | FYFE GROUP, LLC | Exec Dt: 12/30/2010 | |
| Assignee: | FYFE BETA, INC. | | |
| | 8380 MIRALANI DRIVE | | |
| | SUITE A | | |
| | SAN DIEGO, CALIFORNIA 92126 | | |
| Correspondent: | KURT F. JAMES | | |
| | SENNIGER POWERS LLP | | |
| | 100 NORTH BROADWAY, 17TH FLOOR | | |
| | ST. LOUIS, MO 63102 | | |

## Assignment: 6

| Reel/Frame: | 026807/0862 | Recorded: 08/25/2011 | Pages: 3 |
| Conveyance: | ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| Assignor: | FYFE BETA, INC. | Exec Dt: 08/22/2011 | |
| Assignee: | DEFENSTECH INTERNATIONAL INC. | | |
| | 5391 OCEANUS DRIVE | | |
| | HUNTINGTON BEACH, CALIFORNIA 92649 | | |
| Correspondent: | KURT F. JAMES | | |
| | SENNIGER POWERS LLP | | |
| | 100 NORTH BROADWAY, 17TH FLOOR | | |
| | ST. LOUIS, MO 63102 | | |

## Assignment: 7

| Reel/Frame: | 026830/0592 | Recorded: 08/30/2011 | Pages: 3 |
| Conveyance: | ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS). | | |
| Assignor: | FIBRWRAP CONSTRUCTION, LP | Exec Dt: 08/29/2011 | |
| Assignee: | DEFENSTECH INTERNATIONAL INC. | | |
| | 5391 OCEANUS DRIVE | | |
| | HUNTINGTON BEACH, CALIFORNIA 92649 | | |
| Correspondent: | KURT F. JAMES | | |
| | SENNIGER POWERS LLP | | |
| | 100 NORTH BROADWAY, 17TH FLOOR | | |
| | ST. LOUIS, MO 63102 | | |

Search Results as of: 03/02/2012 11:56 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.1
Web interface last modified: Jan 26, 2012 v.2.3.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV13- 179 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Robert N. Phan; Garcia & Phan
17011 Beach Blvd., Suite 540
Huntington Beach, CA 92647
Telephone: 714-848-8200
Facsimile: 714-677-4005

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| DEFENSTECH INTERNATIONAL, INC. | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | SACV13 - 00179 JST (ANx) |
| v. | |
| FYFE CO., LLC; FYFE ENTERPRISES, INC.; HEXCEL-FYFE CO., LLC; FIBRWRAP CONSTRUCTION, L.P.; FIBRWRAP.CONSTRUCTION, INC.; FYFE GROUP, LLC; FYFE BETA, INC.; FIBRWRAP CONSTRUCTION CANADA LIMITED; FYFE HOLDINGS, LLC; FIBRWRAP CONSTRUCTION SERVICES, INC.; FIBRWRAP CONSTRUCTION SERVICES USA, INC.; EDWARD ROBERT FYFE; HEATH CARR; and DOES 1 through 100, inclusive     DEFENDANT(S). | SUMMONS |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Robert Phan_____, whose address is _17011 Beach Blvd., Suite 540, Huntington Beach, CA 92647_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____FEB - 4 2013____

By: _____
DODJIE LAGMA
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| DEFENSTECH INTERNATIONAL, INC. | FYFE CO., LLC; FYFE ENTERPRISES, INC.; HEXCEL-FYFE CO., LLC; FIBRWRAP CONSTRUCTION, L.P.; FIBRWRAP CONSTRUCTION, INC.; FYFE GROUP, LLC; FYFE BETA, INC.; FIBRWRAP CONSTRUCTION CANADA LIMITED; FYFE HOLDINGS, LLC; FIBRWRAP CONSTRUCTION SERVICES, INC.; FIBRWRAP CONSTRUCTION SERVICES USA, INC.; EDWARD ROBERT FYFE; HEATH CARR; and DOES 1 through 100, inclusive |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Robert Phan; Garcia & Phan 17011 Beach Blvd., # 540, Huntington Beach, CA 92647 phone: 714-848-8200; facsimile 714-677-4005 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ 125,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC section 1331, patent violations. This case deals with Plaintiffs' former director and shareholder who committed fraud against Plaintiff and violated Plaintiff's patent

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☒ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

SACV13 - 00179 JST (ANx)

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Diego County; Delaware |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** /s/ Robert N. Phan _____ Date 01-29-13

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |